**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 19 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

WALTER GENE GRASSIE,

        Defendant - Appellant.

No. 99-2281

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. CR-98-516-LH)**

---

Jill M. Wichlens, Assistant Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the briefs), Denver, Colorado, for appellant.

Linda F. Thome, Department of Justice, Washington, D.C. (Norman C. Bay, United States Attorney, Albuquerque, New Mexico; Robert R. Gorence, Assistant United States Attorney, Albuquerque, New Mexico; Bill Lann Lee, Assistant Attorney General, Washington, D.C.; and Jessica Dunsay Silver, Department of Justice, Washington, D.C., with her on the brief), for appellee.

---

Before **BALDOCK**, **ANDERSON**, and **BRORBY**, Circuit Judges.

---

**ANDERSON**, Circuit Judge.

---

Walter Gene Grassie appeals his conviction and sentence, following a jury trial, on charges of burning down a church and defacing and damaging four churches belonging to The Church of Jesus Christ of Latter-day Saints ("LDS" or "Mormon" herein); and the arson of a truck. The church arson was charged under three separate statutes: felony destruction of a church by fire, because of the religious character of the property, in violation of 18 U.S.C. § 247 (Count I); arson of a building or vehicle used in any activity affecting interstate commerce, in violation of 18 U.S.C. § 844(i) (Count II); and, under 18 U.S.C. § 844(h)(1), a mandatory consecutive sentence of ten years for the commission of any federal felony by the use of fire or an explosive (Count III). The arson of the vehicle was charged under § 844(i) (Count X); and the vandalism of the four churches was charged as six separate misdemeanors under § 247 (Counts IV through IX). Mr. Grassie was sentenced to fifteen years imprisonment, restitution of $2,999,199.17 for the church damage and arson, and $1,316.74 for the vehicle arson, three years supervised release, and a special assessment of $550.

Mr. Grassie raises the following issues on appeal. First, whether, as to the interstate commerce element of the charged offenses, the recent opinion of the Supreme Court in Jones v. United States, 120 S. Ct. 1904 (2000), either overruled law in this circuit, or established new law or analysis, which requires reversal of the convictions in this case because of, inter alia, (a) insufficient evidence on

multiple factors relating to the interstate commerce requirement; (b) error in the jury instructions which permitted consideration of "any effect," rather than a "substantial effect" on interstate commerce; and (c) unconstitutionality of the statutes as applied. Second, in any event, whether the evidence was insufficient to support the jury's determination that the truck Grassie set on fire was used in an activity affecting interstate commerce. And, third, whether Grassie's conviction and sentence under both §§ 247 and 844(h)(1) for a single church arson constitutes cumulative punishment in violation of the Double Jeopardy Clause.

We exercise jurisdiction under 28 U.S.C. § 1291 and, for the reasons set out below, affirm.

## I. BACKGROUND

Mr. Grassie does not dispute the jury's determination that he committed the charged acts, and did so intentionally, maliciously and, as to the churches, with anti-Mormon animus. Accordingly, we refer to only the central relevant facts.[1]

---

[1]Volumes III - XIII and Supplemental Volume I of the Record contain the trial transcript and are consecutively paginated. As a matter of convenience, we cite to the trial transcript (Tr.) where possible and cite to the Record and appropriate volume and page number only when the cited material is not found in the trial transcript.

## A.    The Church Buildings

During May and June 1998, Mr. Grassie committed serial acts of vandalism and desecration of LDS church buildings in Roswell, Alamogordo, Alto and Artesia, New Mexico, ultimately setting fire to and completely destroying the church in Roswell. The damage ran into the millions of dollars.[2] These acts are detailed more fully as follows.

On May 2, 1998, Mr. Grassie threw paint the color of blood (Tr. at 885) on two exterior brick walls of the church in Roswell, covering the church name sign. The individual in charge of maintenance recommended to the area maintenance supervisor in El Paso, Texas, various methods of abatement, including high steam jets, and hiring the use of the city's sodium blaster. Finally, the name sign had to be removed for renovation, and the bricks were sandblasted, damaging them. Traces of paint were still observable. All of the funds for repair and restoration were approved by the maintenance supervisor in El Paso, Texas, and the funds were paid through that office.

On May 22, 1998, Grassie returned to the Roswell church building and this time threw dark brown stain on the exterior walls. The name sign was still undergoing restoration off site.

---

[2]At trial the Roswell Stake President estimated the loss of the church by fire at about $2,500,000 and the vandalism damage at about $120,000. Tr. at 433-34. At sentencing, restitution was calculated at $2,999,199.17.

On Monday, May 25, 1998, the Memorial Day holiday, Mr. Grassie attacked the LDS churches in both Alamogordo and Alto, New Mexico. In Alamogordo, he threw dark brown stain on three exterior walls of the church, and on the church name sign. He then broke a window, entered the church, and poured stain over the pulpit, and puddled stain inside the grand piano, over the strings, and on the outside, including the keyboard.

Grassie then proceeded to Alto, where he broke every window but one in the LDS church (twenty of twenty-one) and a glass door. He entered the church where, using a blunt object similar to a pipe, he smashed the pulpit, the organ, two pianos, multiple doors, which also had knobs broken off, and overturned a computer. Keys from the pianos and organ were beaten off and scattered on the floor, the legs and front of a piano were broken and beaten off, and both pianos were overturned.

The following day, May 26, 1998, Grassie returned a third time to the Roswell church. He broke in and, using a sharp-edged tool similar to a machete, he hacked up the pews, organ, grand piano, and three other pianos located throughout the building, scattering keys on the floor. He chopped the gym floor in the cultural hall, a table top, and items in the kitchen. He also damaged a computer in the family history center, and multiple doors, chopping them and knocking off knobs. He damaged the water fountain, then turned on the water in

the baptismal font and broke the faucet off to keep the water running, resulting in flooding down the hallway and into the family history center, leaving film and other library materials floating in water.

On May 26, Grassie then proceeded to the town of Artesia where he attacked the LDS church in that town. Using a sharp-edged instrument, he hacked up the organ, two pianos, pulpits and doors, again knocking knobs off. He desecrated the sacrament table, broke the church's floor-to-ceiling window, knocked a hole in the wall in the office area, damaged electronic equipment in the offices, smashed the light fixture in the foyer, and damaged the water fountain. He then turned on both faucets in the baptismal font and left them running.

Finally, on June 28, Grassie returned for a fourth time to the Roswell church. In the middle of the night he climbed onto a flat roof, poked out a window, poured gasoline down the interior wall and onto the floor of the chapel, and ignited it. The church burned the rest of the night. It was completely destroyed, leaving only some exterior brick walls standing.

The LDS church building in Roswell was the only one in town. Id. at 467, 480. The church members comprised two wards (congregations of up to 300 members each) which shared the Roswell church building. Id. at 467, 1196. In addition, the building was a stake center (stakes are comprised of a number of wards) for the wards in Clovis, Portales, Lovington, Hobbs, Carlsbad, Artesia,

and Roswell.  Id. at 458-59.  The stake president, high council, stake financial clerk and other stake positions had offices in the building and members from the six cities outside Roswell, listed above, traveled to the building for meetings of members of the stake.  Id. at 263, 458-59, 463, 482.  The wards using the buildings in Alamogordo and Alto were in another stake, administered from another city.  Id. at 458-59.

Among other things, the church building in Roswell contained a chapel, multi-cultural hall (including a gymnasium for basketball and other social and recreational activities), classrooms for religious instruction, nursery, kitchen, relief society (women's organization) room, library containing equipment and teaching materials, baptismal center, primary (children's) room, high council room, multiple offices for the bishops and officers administering the affairs of each ward, offices for the stake president, and a family history center for genealogy work.  The offices of the bishop and stake president contained computers and other electronic equipment, telephones used for local and long distance calls (id. at 670), and other things related to administration, including, by inference, membership, financial and other records.  The family history center, comprising two rooms, contained computers, films, microfiche, microfilm readers, and other information and equipment.  Id. at 610, 637-38, 643.

After the destruction of the Roswell church, the members had no comparable facilities to use for their many activities. They were reduced to renting space in two buildings. Id. at 239-40.

The LDS churches in Alamogordo, Alto and Artesia had similar functions and spaces, with the exception of stake offices, which were in Roswell. As was the case in Roswell, the churches in Alamogordo, Alto and Artesia were the only ones in town, and the members in those cities were dependent upon those buildings for all their activities.

As defense counsel acknowledged, the LDS church has more activities in its buildings than most churches. Id. at 1197-99. Testimony at trial established directly and by reasonable inference the extensive use of these church buildings for a broad range of religious, cultural, social, recreational, welfare, educational, and financial activities. Additionally, the buildings were the site for organizing and dispatching youth groups, such as the boy scouts, on trips (e.g., the Gila River trip by a scout troop from a ward in Las Cruces (id. at 1190, 1195, 1198)), proselyting (id. at 1403), and operating family history centers, used by members and the general public, which were operationally active in sending and receiving genealogical information across state lines (id. at 610, 637-38, 873, 1203).[3] The

_____

[3]Contrary to Grassie's assertions on appeal that the family history centers, their computers, libraries, microfilm readers, and other research and data

(continued...)

churches were open to the public, including members and others traveling interstate and seeking a meeting house on Sunday—an activity especially impacted by the fact that the churches in question were the only LDS meeting houses in their respective towns. <u>See</u>, <u>e.g.</u>, <u>id.</u> at 467.

As defense counsel established through cross-examination, these buildings served members of a unitary, monolithic religious faith, the leaders of which are a first presidency and twelve apostles residing outside New Mexico. <u>See</u>, <u>e.g.</u>, <u>id.</u> at 461, 619. Thus, by reasonable inference and direct evidence, there was from these church buildings a constant flow of information, money, travel, and purchase and delivery of goods back and forth across state lines. For example, the funds for repair, restoration, and paid custodial services were disbursed from an area office in El Paso, Texas. Library materials, a wide variety of office and teaching equipment, recreational equipment such as basketballs, sacerdotal accessories, and so on, were obviously purchased in interstate commerce.

Accordingly, after discussions with government counsel prior to trial, defense counsel entered into the following stipulation of facts with the government: "The parties stipulate that at all times relevant to the indictment the

---

[3](...continued)
transmission facilities were merely passing uses of the buildings, genealogy work using these facilities is a religious tenet and active imperative in the LDS church. <u>See</u> testimony of Keith Heine, <u>id.</u> at 460 (explaining that work for the kindred dead is a religious observance).

Mormon churches in Roswell, Alamogordo, Alto and Artesia were engaging in activities affecting interstate commerce." Gov. Ex. 247, id. at 465-66. That stipulation was read to the jury as one of fact to be taken into account by them in their deliberations. The jury was not instructed that they should reach a particular verdict on the issue.

It is clear from the trial record that the parties intended that, as to the churches, the stipulation would establish facts necessary to satisfy the Commerce Clause elements of both §§ 247 and 844(i) for the charged offenses. Because of this and other stipulations, government counsel represented to the court and defense counsel that it would not call twelve witnesses it was prepared to call. Id. at 16.

Consistent with their understanding of the reach and meaning of the stipulation for the church damage and arson counts, neither counsel pursued the matter in opening statements, at trial, or in closing argument, except for a reference to the stipulation by government counsel when arguing to the jury on the interstate commerce element of the crime (id. at 1938-39) — a reference which was not disputed or qualified by defense counsel in closing argument. Defense counsel at no time argued to the court, by motion or otherwise, either before, during or after the trial, or argued to the jury, that proof was lacking as to

the interstate commerce element of the statutes where the church counts were concerned.

### B.    The Truck Arson

On the night of June 17-18, 1998, Grassie drove to a residence in a rural area on the outskirts of Las Cruces, New Mexico, poured gasoline on a 1984 Ford Bronco II, and set the truck on fire.  According to the restitution order, the damage amounted to $1,316.74.  The truck belonged to Norman Jensen, a young man in his twenties, the son of a woman who had angered Grassie by breaking off a relationship with him.  The woman had recently moved from the Roswell area after being harassed by Grassie.

Mr. Jensen, a part-time student, was living in a dwelling owned by Ruth Jones and rented to Jensen in exchange for services he performed for her on and in connection with her property.  Those services included gardening, handyman work, general upkeep, cleaning ditches, and hauling limbs and other materials associated with the eighteen to twenty pecan trees on Jones' property.  For the previous four or five years, the entire period Jensen owned the truck, Jensen's duties as part-time employee of Jones included hauling the annual harvest from Jones' pecan trees to a broker, David Byrd.  Id. at 994, 1005, 1013, 1020.  Byrd sold the pecans in interstate commerce, as part of a larger load, to buyers in

Arizona and Texas. Id. at 1040-41. The annual harvest occurred sometime between Thanksgiving and February. Jones' crop ran anywhere between 560 and more than a thousand pounds, requiring several trips by Jensen in his truck. Id. at 1013, 1047, 1070. Mrs. Jones received anywhere from $775, perhaps up to $2,000 annually (extrapolating from the amount Jones received for a low yield crop of 560 pounds in 1998, after expenses for Byrd's services in harvesting and hauling that year), from out of state buyers. Id. at 1041, 1047, 1070. Jensen also used his truck on two occasions to drive Mrs. Jones to the airport in El Paso, Texas, and on other occasions picked up her daughter. He considered these services part of his duties as a part-time employee. Id. at 1005, 1014-15.

The record does not disclose how significant the pecan income was to Mrs. Jones; but it establishes that she was a widow, that she was retired, and that she leased some adjacent property to a farmer, as well as renting and furnishing utilities to Jensen for services.

### C. Sentencing

With one exception, all the sentences imposed on Grassie by the court were concurrent, totaling five years for Counts I, II and IV through IX. Count III, pursuant to the terms of 18 U.S.C. § 844(h)(1), mandates an additional consecutive sentence of ten years, resulting in a total sentence here of fifteen

years. Specifically, the district court imposed a guideline sentence of fifty-seven months on Count I (destruction of a church by fire), a mandatory minimum sentence of five years on Count II (arson of a building used in an activity affecting interstate commerce), a mandatory consecutive sentence of ten years on Count III (use of fire in the commission of any federal felony—here the church arson in violation of 18 U.S.C. § 247 as charged in Count I); guideline sentences of one year each on Counts IV through IX (the misdemeanor vandalism counts under § 247), and a mandatory minimum sentence of five years on Count X (the truck arson, charged under 18 U.S.C. § 844(i)).

As indicated by the concurrent sentences, any reversal on part, but not all of the felony counts, will likely have no practical effect on Grassie's sentence, except for a reversal of Count III which mandated the ten-year consecutive sentence. Thus, it is this latter sentence which Grassie most vigorously attacks as an alleged violation of the Double Jeopardy Clause.

## II. DISCUSSION

### A.    Interstate Commerce

The district court properly instructed the jury that in order for them to find Mr. Grassie guilty, the evidence must establish beyond a reasonable doubt the

effect on interstate commerce required by statute.[4]  It also instructed, in part, that "[i]f you decide that there would be any effect at all on interstate commerce, then that is enough to satisfy this element."  R. Vol. I, Doc. 77 at Instr. 8, 10.[5]

_____

[4]18 U.S.C. § 247 provides in pertinent part as follows:

> **§ 247.      Damage to religious property; obstruction of persons in the free exercise of religious beliefs**
> (a) Whoever, in any of the circumstances referred to in subsection (b) of this section—
>       (1) intentionally defaces, damages, or destroys any religious real property, because of the religious character of that property, or attempts to do so . . .
>       . . . .
> shall be punished as provided in subsection (d).
>       (b) The circumstances referred to in subsection (a) are <u>that the offense is in or affects interstate or foreign commerce</u>.

(emphasis added).

18 U.S.C. § 844(i) provides in pertinent part as follows:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property <u>used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce</u> shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both . . . .

(emphasis added).

[5]In relevant part, the court instructed the jury as follows:

> _Fourth:_  That the offense was in or affected interstate or foreign commerce.
>       Interstate commerce means commerce or travel between one state, territory or possession of the United

(continued...)

-14-

In his opening brief on appeal, Mr. Grassie, while preserving the issues for possible arguments which might arise under <u>Jones,</u> then pending before the

[5](...continued)
States and another state, territory or possession of the United States, including the District of Columbia. Commerce includes travel, trade, transportation and communication.

The government is not required to prove that the defendant knew that his conduct would interfere with or affect interstate commerce. It is not necessary for the government to show that the defendant actually intended or anticipated an effect on interstate commerce by his actions or that commerce was actually affected. All that is necessary is that the natural and probable consequence of the acts the defendant took would be to affect interstate commerce. If you decide that there would be any effect at all on interstate commerce, then that is enough to satisfy this element.

R. Vol. I, Doc. 77, at Instr. 8 (instructing on a violation of § 247).

> *Third*: That the building, vehicle, or other real or personal property was used in an activity affecting interstate or foreign commerce. The government is not required to prove that the defendant knew that his conduct would interfere with or affect interstate commerce. It is not necessary for the government to show that the defendant actually intended or anticipated an effect on interstate commerce by his actions or that commerce was actually affected. All that is necessary is that the natural and probable consequence of the acts the defendant took would be to affect interstate commerce. If you decide that there would be any effect at all on interstate commerce, then that is enough to satisfy this element.

<u>Id.</u> at Instr. 10 (instructing on a violation of § 844(i)).

Supreme Court, conceded that the evidence was sufficient to support the jury's determination on the interstate commerce element of both §§ 247 and 844(i) as to each of the counts relating to Grassie's attacks on the churches. Appellant's Opening Br. at 37-38. He also conceded that the portion of the jury instruction quoted above was proper in this circuit, both as applied to the church damage and arson counts and as to the count relating to setting fire to Norman Jensen's truck. Id. at 36-38. The only interstate commerce issue he pursued was whether the evidence was sufficient to show that the arson of Norman Jensen's truck had any legally cognizable connection with interstate commerce (id. at 33-35), a point which we address separately below.

Subsequently, the Supreme Court issued its opinion in Jones, following which Mr. Grassie filed a supplemental opening brief containing a single argument heading, as follows:

> MR. GRASSIE'S CONVICTIONS MUST BE REVERSED UNDER JONES V. UNITED STATES, ___ S. CT. ___, 2000 WL 645885 (U.S. MAY 22, 2000)

Appellant's Corrected Supplemental Opening Br. at ii (hereafter "Appellant's Supp. Br."). He then subdivided his argument into the following segments—all necessarily dependent upon his view of Jones' impact on the law:

> 1) [W]hether the damage to the church buildings at issue affected interstate commerce; 2) whether the church buildings were used in an activity affecting interstate commerce; 3) whether the Ford Bronco was used in an activity affecting interstate commerce; and 4)

-16-

whether, if the answer to the above questions is yes, 18 U.S.C. § 247 and 18 U.S.C. § 844(i) as applied exceed the authority vested in Congress under the Commerce Clause of the United States Constitution.

Id. at p.1-2. As developed, these arguments almost exclusively challenge the intertwined issues of the sufficiency of the evidence on the interstate commerce element of all counts under §§ 247 and 844(i), and the legality of the "any effect at all" portion of the jury instructions. See supra note 5. Additionally, Mr. Grassie raises a constitutional issue and invokes the rule of lenity. Appellant's Supp. Br. at 3, 14.

We review the sufficiency of the evidence de novo. United States v. Brown, 200 F.3d 700, 704 (10th Cir. 1999). However, we do so while "viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government. We will reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 704-05 (internal citations and quotations omitted). We review legal challenges to jury instructions de novo to determine whether, considering the jury instructions as a whole, the jury was misled. United States v. Chanthadara, 230 F.3d 1237, 1263 (10th Cir. 2000). Finally, we review properly raised constitutional questions de novo. United States v. Hampshire, 95 F.3d 999, 1001 (10th Cir. 1996).

**(1)     Does the Supreme Court's Decision in <u>Jones v. United States</u> Require Reversal in this Case?**

The posture of this appeal is that Grassie's initial concessions on the sufficiency of the evidence stand unless, as he argues, the Supreme Court's opinion in <u>Jones</u> requires a different outcome. The short answer to Mr. Grassie's supplemental arguments is that <u>Jones</u> does not pronounce law on any point which requires us to reverse these convictions.

The Court's decision in <u>Jones</u> involves a statutory interpretation of 18 U.S.C. § 844(i) and an application of the interstate commerce element of that statute to the arson of an owner-occupied private residence. The Court focused on the "used in" language of § 844(i), stating that those qualifying words demonstrated that Congress had not invoked its full authority under the Commerce Clause. Under the statute as thus qualified, the proper two-step inquiry, according to the Court, "'is into the function of the building [or vehicle] itself, and then a determination of whether that function affects interstate commerce.'" <u>Jones,</u> 120 S. Ct. at 1910 (quoting <u>United States v. Ryan</u>, 9 F.3d 660, 675 (8th Cir. 1993) (Arnold, C.J., concurring in part and dissenting in part)).

Applying that test the Court held that "an owner-occupied residence not used for any commercial purpose does not qualify as property 'used in' commerce or commerce-affecting activity." <u>Id.</u> at 1908. In reaching that conclusion, the Court employed a functional analysis to a building used solely as a private home,

-18-

reasoning that it is not the common perception that the function of a private home is active employment for commercial purposes. It follows, the Court noted, that the delivery of natural gas to the house, insurance, and committing the home as security for a mortgage loan are merely passive, passing or past connections to commerce, thus failing the "use" or "active" employment requirement of the statute.

The Court expressed no view on the "de minimis" standard for effects on interstate commerce. Its focus was on active use versus passive or passing relationship to commerce. The Court required only "active employment" which affects commerce, not a particular quantum of effect.

Indeed, the Court relied upon its prior decision in Russell v. United States, 471 U.S. 858 (1985), where once the use of a building for rental purposes was established, the effect on commerce was simply presumed because of the nature of the activity. In other words, it was not necessary to show dollar amounts, dollar tracing, individual conduct or any other nexus between the two rental units in question and interstate commerce. Clearly, the dollar amount or activity involved in Russell was trivial as a proportion of commerce in rental properties, or all commerce, nationally; but that was not significant because of the nature of the activity in the aggregate.

### a. 18 U.S.C. § 844(i)

As to § 844(i), rather than contradicting our controlling precedent, the Court in <u>Jones</u> confirmed it, citing with approval our opinion in <u>United States v. Monholland</u>, 607 F.2d 1311 (10th Cir. 1979). <u>See Jones</u>, 120 S. Ct. at 1911. In <u>Monholland</u> we focused on the "use" language of § 844(i) and employed a functional analysis to conclude that a truck the defendants conspired to blow up was not actively used in interstate commerce, resulting in a dismissal of the charges. <u>Monholland</u>, 607 F.2d at 1316. We also recognized the propriety of the "de minimis" standard in jury instructions on § 844(i), but we essentially employed the same approach as that in <u>Jones</u> in holding that when no connection at all is made between actual use and interstate commerce, the de minimis standard approved by this circuit is not met. We did not invalidate the standard and we do not believe <u>Jones</u> did.

Both the indictment and the jury instructions in this case required the jury to find that the Roswell church and Jensen's vehicle were used in an activity affecting interstate commerce. We discuss the evidence as to Jensen's vehicle separately below. The evidence as to the Roswell church directly supported the functional analysis required by <u>Jones</u>, beginning with the stipulation that the church in Roswell was "<u>engaging in activities affecting interstate commerce</u>." Gov. Ex. 247, Tr. at 465-66 (emphasis added). The key action verb is

-20-

"engaging," a direct synonym for active use of the building. We have detailed other evidence above which, taken most favorably to the government, supports the jury's verdict.

Additionally, as indicated above, the jury instructions which incorporated an "any effect at all" standard were not erroneous in view of the fact that the "active use" portion of the inquiry was satisfied. Furthermore, even if <u>Jones</u> somehow eliminated the long-established de minimis effect standard in this circuit, the "any effect" instruction here would be harmless error at best since the jury <u>necessarily</u> made its decision in light of an unqualified "affecting commerce" stipulation.

### b. 18 U.S.C. § 247

The Court's opinion in <u>Jones</u> did not address § 247 at all. As to that statute, with its unrestricted Commerce Clause language, we extend our recent decision in <u>United States v. Malone</u>, 222 F.3d 1286 (10th Cir. 2000), in which we stated:

> [T]he language of the Hobbs Act indicates Congress' intention to invoke its full authority under the Commerce Clause. <u>See</u> <u>Jones</u>, --- U.S. at ---, 120 S. Ct. at 1909 (stating that when Congress uses the words "affecting commerce" without qualification, it intends to invoke its full authority under the Commerce Clause). Thus the Hobbs Act does not suggest that Congress intended to limit its jurisdiction in any way. We therefore find <u>Jones</u> inapposite. Thus, we find no error in the district court's instructions to the jury that

-21-

only a de minimis effect on interstate commerce must be proven under the Hobbs Act.

Id. at 1295.[6]

This view of § 247 is fully supported by the legislative history. In the face of a virtual national epidemic of arson and other attacks on churches (mostly identified with African-American congregations) and synagogues, Congress passed the Church Arson Prevention Act of 1996, Pub. L. No. 104-155, 110 Stat. 1392 (1996), amending 18 U.S.C. § 247. The Act, passed by the House 422 to 0, and by the Senate 98-0, was intended by Congress "to exercise the fullest reach of the Federal commerce power" by eliminating previously existing jurisdictional obstacles, including a minimum dollar amount of loss, and broadening the reach of the statute. 142 Cong. Rec. S7908-04 (1996) (joint statement of floor managers regarding H.R. 3525, The Church Arson Prevention Act of 1996). Section 2 of the Act, reported at 18 U.S.C. § 247, recites congressional findings which, in part, find that arson and vandalism of places of worship pose a serious national problem warranting federal intervention and that: "Congress has authority, pursuant to the Commerce Clause of the Constitution, to make acts of

---

[6]See also United States v. Wiseman, 172 F.3d 1196, 1214 (10th Cir. 1999); United States v. Nguyen, 155 F.3d 1219, 1228 (10th Cir. 1998); United States v. Bolton, 68 F.3d 396, 398-99 (10th Cir. 1995); United States v. Schwanke, 598 F.2d 575, 578 (10th Cir. 1979).

-22-

destruction or damage to religious property a violation of Federal law." Church Arson Prevention Act of 1996, Pub. L. No. 104-155, § 2, 110 Stat. 1392 (1996).

To the extent the legislative history is informative on the specific impact of church attacks on interstate commerce, there are references to a broad range of activities in which churches engage, including social services, educational and religious activities, the purchase and distribution of goods and services, civil participation, and the collection and distribution of funds for these and other activities across state lines. See, e.g., 142 Cong. Rec. S7908-04 at *S7909 (1996) (joint statement of floor managers regarding H.R. 3525, The Church Arson Prevention Act of 1996); 142 Cong. Rec. S6517-04, *S6522 (1996) (statement of Sen. Kennedy); see also Church Burnings: Hearings on the Federal Response to Recent Incidents of Church Burnings in Predominantly Black Churches Across the South Before the Senate Comm. on the Judiciary, 104th Cong., 37 (1996) (appendix to the prepared statement of James E. Johnson and Deval L. Patrick).

In summary, nothing in Jones requires reversal of this case as to § 247. The evidence, including the stipulation of facts, was sufficient to support the verdict and the jury instructions were proper.

### c. Commerce and churches; reach of the stipulation; and whether Mr. Grassie should be relieved of his stipulation

Mr. Grassie makes several subsidiary arguments which are equally unpersuasive. First he argues that <u>Jones</u> restricts the definition of "commerce" to the conduct of a traditional profit-seeking trade or business. Appellant's Supp. Br. at 3, 8-9. Thus, he reasons, churches are excluded from the definition of commerce since their purpose is religion, not business. <u>Id.</u> at 9. However, as the Court made clear in <u>Camps Newfound/Owatonna, Inc. v. Town of Harrison</u>, 520 U.S. 564, 584 (1997), the Commerce Clause applies to charitable and non-profit entities. Such entities are major participants in interstate markets for goods and services, use of interstate communications and transportation, raising and distributing revenues (including voluntary revenues) interstate, and so on. <u>Id.</u> at 583-86.[7] Nothing in <u>Jones</u> purports to limit <u>Camps</u>. Religion and, in particular

---

[7]As the Court observed in <u>Camps</u>, the non-profit sector represents a significant percentage of the gross national product. <u>Id.</u> at 586 n.18 (citing figures associated with various activities). Religious organizations, as a division of the charitable and non-profit sector, similarly impact the national economy in orders of magnitude. Recently in testimony before the House Judiciary Committee, Mark B. Stern, testifying on behalf of the American Jewish Congress, filled multiple pages of the record with statistics showing the enormous impact that religion has on commerce and channels of commerce in this country, with houses of worship filling a central economic and animating role. <u>Religious Liberty Protection Act of 1998: Hearings on H.R. 4019 Before the Subcomm. on the Constitution of the House Comm. on the Judiciary</u>, 105th Cong. 57-62 (1998) (prepared statement of Marc D. Stern, Director, Legal Department, American

(continued...)

religious buildings actively used as the site and dynamic for a full range of activities, easily falls within the holding of Camps.

Next, Mr. Grassie argues that his stipulation that the churches referred to in the indictment were engaging in activities affecting interstate commerce did not refer to the actual use of the burned building, and did not establish a nexus between the church arson and damage to any of the churches and an effect on interstate commerce. Appellant's Supp. Br. at 6, 10, 12-13. The record, however,

---

[7](...continued)
Jewish Congress). We will not extend this opinion by reciting this litany of billions of dollars and varied activities. The proposition is self-evident to an informed observer of this nation.

According to standard reference works, the Church of Jesus Christ of Latter-day Saints abundantly illustrates the point. Headquartered in Salt Lake City, Utah, it has millions of members nationally and internationally. The members' income is tithed and those immense revenues, along with offerings of goods and services for welfare for the needy, flow across state lines for administration, allocation, and distribution by General Authorities of the Church in Salt Lake City. The Church has an active proselyting program resulting in significant travel nationally and internationally. Genealogy work using national and international channels of communication is a religious tenet. The Church also operates an extensive educational system from seminaries at the high school level to multiple fully-accredited universities, mostly funded by tithing revenues from members. The Church also supports athletics, the arts, and cultural events. It also uses television, radio, and the Internet to project its messages. It is beyond dispute that all of this, and more, amounts to a massive flow of goods, services, revenues, travel, use of all channels of communication, and so on, in and affecting intestate commerce. The New Encyclopædia Britannica, Vol. 8 at 327-29 (15th ed. 1997); The World Book Encyclopedia, Vol. 13 at 806-09 (1999); Compton's Encyclopedia & Fact-Index, Vol. 15 at 583-84 (1997); The Encyclopedia of Religion, Vol. 10 at 108-12 (1987); Encyclopedia of American Religions at 563-64 (5th ed. 1996).

-25-

shows that defense counsel regarded the stipulation as sufficient for all these purposes. Indeed, when government counsel stated he was going to have a witness testify as to the dollar amount of the damages caused by Grassie, defense counsel objected to such evidence if its purpose was to show a nexus between the offense and interstate commerce, reasoning as follows: "I had thought perhaps Mr. Gorence was going to say that he needed the value of the church, the damage to the church in order to establish some nexus with interstate commerce. Of course, that's been the subject of a stipulation." Tr. at 315-16. Defense counsel went on to say that in view of the stipulation, such evidence would be "severely prejudicial to Mr. Grassie" and a violation of Fed. R. Evid. 403 as more prejudicial than probative. Id. at 316-18. Government counsel agreed that the stipulation satisfied the interstate commerce element, noting that the proposed damage evidence was simply intended to prove the "damage" or "destroy" elements of the statutes. Id. at 317-18.

The stipulation was clearly a tactical decision by the defense to avoid having the jury hear extensive and doubtless emotionally charged testimony about the manifold uses of these buildings, their centrality and importance, and the nexus between these offenses, the functions of the buildings, and interstate commerce. This tactic successfully induced the government not to call up to

twelve witnesses who would have furnished detailed evidence supporting the commerce affecting element of the charged offenses.

Mr. Grassie argues in the alternative that he ought to be relieved from his stipulation of facts "to prevent manifest injustice." Appellant's Opening Br. at 38 (citing United States v. Harding, 491 F.2d 697, 698 (10th Cir. 1974)). However, he fails to show why, in this area of case-by-case determinations, it is manifestly unjust to hold him to his stipulation of facts at trial. As indicated earlier in this opinion, he entered into that stipulation in the face of established law in this circuit which, as we have discussed, Jones has not changed in any way relevant to this case; and he was clearly aware of the abundant evidence on the point which the government was prepared to put on. As we have explained, defense counsel evidently regarded that prospect as harmful to the defense and tactically chose to avoid the problem.

### d. **United States v. Johnson** and **United States v. Rea**

Nor do the cases of Johnson and Rea, both vacated by the Supreme Court and remanded for further consideration in light of Jones, aid Mr. Grassie. United States v. Johnson, 194 F.3d 657 (5th Cir. 1999) vacated by 120 S. Ct. 2193 (2000); United States v. Rea, 169 F.3d 1111 (8th Cir. 1999) vacated by 120 S. Ct. 2193, remanded to 223 F.3d 741 (8th Cir. 2000). Both of those cases dealt with

prosecutions under § 844(i) for church arsons, and do not involve § 247. Furthermore, as to § 844(i), both are distinguishable from this case. Neither involved the stipulation of facts, and other evidence regarding the required use of these buildings in activities affecting interstate commerce, that was presented at the trial of this case. Furthermore, Johnson, unlike the LDS churches here, involved an autonomous congregation which paid dues to a national organization. To the contrary, as the evidence here indicates, the LDS church is a monolithic, unitary organization. The wards and stake center in question do not pay dues. Revenues raised and transmitted or received, as well as other uses of the channels of commerce, are all within the national (and international) organization of the church.

### e. Alleged unconstitutionality as applied

Finally, Mr. Grassie briefly argues that §§ 247 and 844(i) are unconstitutional as applied to this case. The argument was not raised in the district court. In the appellant's opening brief the subject covers five lines, cites no authority, gives no rationale, and looks ahead to the Court's opinion in Jones. Appellant's Opening Br. at 36-37. In his supplemental opening brief, Grassie covers the subject in eight lines, this time offering the rationale that arson is a paradigmatic common law state crime, and in this case the buildings and their use,

and the vehicle's use, did not have a commercial character, citing <u>Jones</u> and <u>United States v. Lopez</u>, 514 U.S. 549, 580 (1995) (Kennedy, J. concurring).

We have discussed <u>Jones</u> above, along with the question of whether churches can ever be involved in activities affecting interstate commerce. To that discussion we add that by making interstate commerce an element of the crime under both § 247 and § 844(i), to be decided on a case-by-case basis, constitutional problems are avoided. <u>See</u> <u>United States v. Morrison</u>, 120 S. Ct. 1740, 1751 (2000); <u>Lopez</u>, 514 U.S. at 561-62; <u>Malone</u>, 222 F.3d at 1295.

We decline to pursue the issue by raising, then answering, further arguments on the subject.

### (2)     The Truck Arson

In his opening brief, Mr. Grassie contends that the evidence was insufficient to support a jury finding that the use of Norman Jensen's truck had even a de minimis effect on interstate commerce. Appellant's Opening Br. at 30-35. He pursues this argument in his supplemental brief dealing with the alleged impact of <u>Jones</u>. Appellant's Supp. Br. at 11.

Sufficiency of the evidence as to whether Norman Jensen's truck was used in an activity affecting interstate commerce presents a more difficult question than the church damage and arson convictions. We note, however, that a reversal

on this count will have little or no effect in view of the convictions on the church damage and arson counts.

As Mr. Grassie points out, Jensen's truck was mostly used for personal purposes such as going to school. Its active connection with interstate commerce was several trips each year (not in June, at the time of the arson) transporting Mrs. Jones' pecans to a broker. The distance was short, approximately two miles according to Mr. Jensen. Tr. at 1006, 1012. The amount was not great, and the time involved was not specified. There was no evidence as to what fraction of the truck's use in a year was devoted to either transporting the pecans or doing work in connection with that operation, such as picking up or transporting fallen branches and cleaning ditches. Nor was there any evidence as to the significance of the pecan sale income to Mrs. Jones, although the record establishes that she was retired and a widow with no other business except for leasing some adjacent property for farming.

As the Supreme Court points out in Jones, § 844(i) requires that the vehicle must have been actually used in an activity affecting interstate commerce. And, as we stated in Monholland, the nexus between the vehicle's use and interstate commerce cannot be so remote as to be something less than de minimis. Monholland, 607 F.2d at 1316. This truck's use approaches that level.

However, on the other hand, we reject the contention that the pecan sales were not sales in interstate commerce. Any favorable view of David Byrd's testimony establishes that he received the Jones pecans as a broker, sold them in interstate commerce, and passed along to Mrs. Jones her share of the payment received from the out-of-state buyer. We also reject the argument that Jensen's truck had to be actively employed in the pecan harvest transport at the precise time of the arson. The record clearly establishes a settled, regular annual pattern of engagement of Jensen's truck, over a period of years, without interruption, for the transport in commerce of Jones' pecan harvest. It also fairly establishes that Mrs. Jones expected the use of Jensen's truck for this purpose as part of Jensen's payment for rent and utilities, and that it was so employed.

The duration and continuity, over a period of years, of this commercial use of Jensen's truck, overcomes the fact that the use was largely seasonal. The truck was engaged long term for specified periodic, including seasonal, work. Taking the evidence in the light most favorable to the government, as we must, we cannot say that the evidence is insufficient to support the jury's verdict.

### B. Double Jeopardy

Mr. Grassie contends his conviction and sentence on both a charge under 18 U.S.C. § 247 of destroying a church by fire because of the religious nature of the

property—the underlying felony—and a charge under 18 U.S.C. § 844(h)(1) of using fire to commit any federal felony, violates the Double Jeopardy Clause of the Fifth Amendment. He raised this issue by motion prior to trial, seeking a dismissal of Count III on the ground that it constituted the same offense as that charged in Count I—both based on a single act of church burning. The district court denied the motion in a well-reasoned written opinion. R. Vol. I, Doc. 71. Applying a de novo standard of review, we agree with the district court's decision.

It is settled that Congress and state legislatures can impose cumulative punishments in a single trial for the same criminal conduct without offending the Double Jeopardy Clause of the Constitution. See Whalen v. United States, 445 U.S. 684, 688-89 (1980); Missouri v. Hunter, 459 U.S. 359, 366-68 (1983); United States v. Overstreet, 40 F.3d 1090, 1093 (10th Cir. 1994); United States v. Lanzi, 933 F.2d 824, 825 (10th Cir. 1991). The question is whether "the legislature, as expressed in the language of the statute or its legislative history, clearly intended cumulative punishment under two different statutory provisions . . . ." Lanzi, 933 F.2d at 825. As indicated, the central inquiry is one of statutory construction.

> Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under Blockburger [v. United States, 284 U.S. 299 (1932)], a court's task of statutory construction

-32-

is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

Hunter, 459 U.S. at 368-69.

Subsections (a) and (d)(3) of § 247 provide in relevant part as follows:

> (1)    Whoever . . .
> > (1)    Intentionally . . . destroys any religious real property, because of the religious character of that property . . .
> >    . . . .
> > shall be punished as provided in subsection (d).
> >    . . . .
> (d)    The punishment for a violation of subsection (a) of this section shall be . . .
> > (3)     . . . if such acts include the use, attempted use or threatened use of a dangerous weapon, explosives, or fire, a fine in accordance with this title and imprisonment for not more than 20 years or both.

Section 844(h)(1) creates a separate, independent offense distinct from the underlying federal felony in § 247.  It provides in relevant part as follows:

> (h)    Whoever —
> (1) uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States . . .
>
> * * *
>
>    . . . .
> including a felony which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years. . . .  Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment

including that imposed for the felony in which the explosive was used or carried.

18 U.S.C. § 844(h).

There are no cases which address whether the language of these statutes or their legislative history express a congressional intent that the punishments under §§ 247 and 844(h)(1) should be cumulative. But, there are analogies which can be drawn from the punishment provided in 18 U.S.C. § 924(c)(1) for using or carrying a firearm.[8]

We held in Lanzi that the plain language of § 924(c)(1) evinces congressional intent that any defendant using a firearm in connection with a

_____

[8]Section 924 provides in pertinent part:

(c)(1)(A)  [A]ny person who, during and in relation to any crime of violence . . . (including a crime of violence . . . that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, . . . shall, in addition to the punishment provided for such crime of violence . . .
        (i) be sentenced to a term of imprisonment of not less than 5 years . . . .
        (D)    Notwithstanding any other provision of law–
        (i) a court shall not place on probation any person convicted of a violation of this subsection; and
        (ii) no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence . . . during which the firearm was used, carried, or possessed.

18 U.S.C. § 924(c)(1).

violent crime must be sentenced to five years imprisonment in addition to the sentence imposed for the underlying felony, even if that felony imposes its own punishment for using a firearm (armed robbery of a credit union in violation of 18 U.S.C. § 2113 (a) and (d) in that case). Lanzi, 933 F.2d at 825-26. And in Overstreet, we applied the same reasoning in holding that punishment under § 924(c)(1) is intended to be additional and consecutive to that imposed under the federal carjacking statute, 18 U.S.C. § 2119, which specifies use of a firearm as an element. Overstreet, 40 F.3d at 1093-94.

Mr. Grassie does not dispute that if he had damaged or destroyed the Roswell Stake Center with a bomb he would be properly subject to multiple, consecutive punishment under both §§ 247(d)(3) and 844(h)(1) for using an explosive. Appellant's Opening Br. at 11, 29.

His argument and, accordingly, our statutory analysis is narrower. He contends that § 844(h)(1) does not authorize cumulative punishment for the use of fire to commit a felony because: (1) the cumulative punishment clauses of the statute do not use the word fire; they refer to predicate felonies which provide enhanced punishment for using a "deadly or dangerous weapon or device," and for consecutive punishment where the underlying felony is one in which "the explosive" was used or carried; (2) the omission of a specific reference to fire in the cumulative punishment clauses of the statute evidences a congressional intent

-35-

to limit cumulative punishment to the use of explosives, or at least creates an ambiguity which justifies applying the rule of lenity and the holding in Busic v. United States, 446 U.S. 398 (1980), and Simpson v. United States, 435 U.S. 6 (1978); (3) the legislative history of § 844 (h)(1), specifically that relating to the 1988 amendment which added the cumulative punishment language in question, refers only to explosives, not to fire; (4) a literal reading of § 844(h)(1) would unreasonably include its application to 18 U.S.C. § 844 (i), the general arson statute, which no court has ever done and the government has apparently never asserted; and (5) the legislative history of the 1994 amendment to § 247, adding the use of fire as a felony for damaging or destroying religious property, and the 1996 amendment increasing the penalty, make no mention of § 844(h)(1) or any maximum penalty for the use of fire beyond that provided in § 247(d)(3), thus, allegedly, evidencing congressional intent not to permit multiple punishment for using fire.

The central theme of these arguments is that the omission of the word "fire" from the cumulative punishment clauses of § 844(h)(1) means that Congress did not intend § 844(h)(1) to apply to felonies which enhance punishment if committed by fire. In other words, explosives, but not fire, are covered. The problem with this reasoning is that the operative words of the cumulative punishment clause also fail to specify explosives. The clause provides

-36-

that the use of fire or an explosive to commit any federal felony includes "a felony which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device." 18 U.S.C. § 844(h)(1) (emphasis added).

Mr. Grassie attempts to explain this anomaly in his reasoning by arguing, in essence, that "deadly or dangerous weapon or device" is a synonym for "explosive" but excludes "fire," citing an unpublished opinion from the Ninth Circuit relating to other statutes, and definitions of destructive device and explosive or incendiary device contained respectively in 18 U.S.C. § 921(a)(4) and 18 U.S.C. § 232(5). We are unpersuaded. Even under Mr. Grassie's view of the statute, the term "explosive" must be encompassed within the term "deadly or dangerous weapon or device"; and, under any ordinary construction of the English language "fire," when used to commit a felony, is surely encompassed within the adjectives "deadly or dangerous" in describing weapons.

By pairing fire with explosives in § 844(h)(1), Congress clearly placed these weapons in parity, and signaled its view that the commission of felonies by these means constitutes the use of a deadly or dangerous weapon or device. Grassie's escalating use of methods for damaging these church properties—from pipes to machete-like objects to a gasoline ignited fire that completely destroyed this church—highlights the dangerousness of the use of fire as a weapon. In our

circuit we have even classified gasoline as an explosive.  <u>United States v. Poulos</u>, 667 F.2d 939, 942 (10th Cir. 1982).

It is irrational to view § 844(h)(1) as first explicitly linking fire and explosives for additional punishment when used in committing any felony then, sub silentio, delinking fire from that pairing for purposes of the cumulative punishment clause which refers expansively to deadly or dangerous weapons or devices.  Nor do we read the term "the explosive" in the final clause of § 844(h)(1) as a limiting definition for the entire section, since the operative words, discussed above, clearly eschewed a limitation to explosives.  And, we regard the statutory use of the word "including" which immediately precedes a reference to the words "the explosive" as the preface for a representative or illustrative example, and not as a term of restriction or exclusion for anything not expressly specified.

The fact that § 247, which was revised after the relevant amendment to § 844(h)(1), does not cross-reference § 844(h)(1), and is a more specific statute than § 844(h)(1), does not change our analysis.  As we said in an analogous circumstance:

> The mere fact that section 2119 was enacted after section 924(c)(1), but does not reference section 924(c)(1), does not alter our conclusion that Congress intended cumulative punishments under the two statutes.  "Congress may make a plain statement of its intent to stack punishments in a specified class of crimes as it did in § 924(c)(1).  Once Congress does that, it need not reiterate that intent

in any subsequent statutes that fall within the previously defined
class."

Overstreet, 40 F.3d at 1094 (quoting United States v. Singleton, 16 F.3d 1419,
1427-28 (5th Cir. 1994)).

Mr. Grassie accurately describes the sparse legislative history of the
cumulative punishment amendment to § 844(h)(1) as referring to explosives and
being silent on the subject of fire. That silence does not control our view of what
we regard as the plain meaning of the statute on its face.

Finally, since we do not regard that statute as ambiguous, the rule of lenity
does not compel a result for Grassie; and, the reasoning contained in Simpson and
Busic does not apply. In response to Simpson and Busic, Congress amended
§ 924(c) to make more explicit that the statute as originally drafted intended
separate and additional punishment for using or carrying a firearm during or in
relation to any crime of violence. See Lanzi, 933 F.2d at 825-26 (tracing the
legislative history of § 924(c) after Simpson and Busic). Subsequently, Congress
similarly amended § 844(h)(1), using language drawn from the amendment to
§ 924(c).[9] That amendment, which is before us in this case, is not as precise as
the change made to § 924(c); but its clear thrust is to reinforce the statute as
originally written to overcome Simpson/Busic problems.

---

[9]Anti-Drug Abuse Act of 1988, Pub. L. 100-690, § 6474(b), 102 Stat. 4181,
4380 (1988).

-39-

The statutory punishment provided under § 247(d)(3) establishes a penalty of imprisonment not to exceed twenty years. Section 844(h)(1) provides for a mandatory term of ten years to be served consecutively to that imposed for the underlying felony. Thus, while the total theoretical statutory maximum could be thirty years, it could also be little more than ten years, and in sentencing under the statute for § 247, the court could adjust under the maximum to account for the mandatory ten-year sentence under § 844(h)(1). Thus, the accumulation of penalties under these two statutes must be tempered in context, keeping in mind that Congress was explicit in § 844(h)(1) about severely punishing people who use fire or explosives to commit felonies. Of course, the Sentencing Guidelines have changed the calculus considerably, limiting the court in this case (absent a departure) to a sentence of just fifty-seven months for Grassie for his arson offense under § 247, and rendering the twenty-year statutory maximum under § 247 academic. However, Grassie's total sentence of fifteen years is well within what the court could have imposed and what Congress has authorized, without the guidelines, under § 247 alone.

## III. CONCLUSION

For the reasons stated above, Mr. Grassie's conviction and sentence on each of the charged counts are AFFIRMED.