**UNITED STATES of America,
Plaintiff,**

v.

**Gerald RAYBORN, Defendants.**

**No. 99–20288 D/V.**

United States District Court,
W.D. Tennessee,
Western Division.

April 16, 2001.

James R. Garts, Jr., James D. Wilson, Harris Shelton, Dunlap, Cobb & Ryder, A.C. Wharton, Jr., Marcus D. Ward, Wharton & Wharton, Memphis, TN, for Gerald Rayborn.

Gerald Rayborn, pro se.

Frederick H. Godwin, Kevin P. Whitmore, U.S. Attorney's Office, Memphis, TN, for U.S. Attorneys.

## ORDER DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION

DONALD, District Judge.

Plaintiff United States of America moves for reconsideration of the Court's August 25, 2000 Order dismissing Defendant Gerald Rayborn's indictment for arson under 18 U.S.C. § 844(i). The Court ruled that it lacked subject matter jurisdiction over the matter because, as applied to the circumstances of the instant case, § 844(i) constitutes an unconstitutional extension of Congress's commerce power. Thereafter, the United States moved for reconsideration, and for an evidentiary hearing. The Court granted the motion for an evidentiary hearing and took testimony on the issue of interstate nexus. For the reasons herein, the Court **DENIES** Plaintiff's motion for reconsideration.

### I. Factual Background

On August 25, 1998, the New Mount Sinai Missionary Baptist Church ("SMBC"), located in Tennessee and pastored by Defendant Gerald Rayborn, was destroyed by fire. Its facilities include a sanctuary, a pastoral facility, and a garage. Before it was destroyed, SMBC paid monthly payments on its $70,000 mortgage. Its facilities were insured for $700,000. SMBC is a non-profit organization. SMBC has acquired a recreational vehicle, a car, a truck, and a tractor. Though 6,000 congregants are recorded as church members, about 1,000 congregants actively attend services. Because SMBC is located close to the state lines, congregants come from Tennessee, Mississippi, and Arkansas. SMBC's collection averages between $9,000 and $10,000 a week.

Most of the money is apparently spent on constructing new facilities, facility maintenance, charitable activities, church related events and the pastor's income and personal expenses.

SMBC broadcasts its services on four radio stations, one of which is located in Mississippi. Broadcasts reach the tri-state area of Tennessee, Mississippi, and Arkansas. SMBC also sponsored church picnics and hosted gospel programs open to the general public.

### II. Analysis

Congress enacted 18 U.S.C. § 844(i) as part of the Organized Crime Control Act, and makes it a crime to damage, by means of fire, any building used in any activity "affecting" interstate commerce. The provision's legislative history indicates that some members of Congress intended the provision to apply to churches. *Russell v. United States*, 471 U.S. 858, 860 n. 5, 105 S.Ct. 2455, 2457, 85 L.Ed.2d 829 (1985). The House Report accompanying the final bill indicated that § 844(i) is a "very broad provision covering substantially all business property." *Id.* at 861 & n. 8, 105 S.Ct. at 2457 (citing H.R.Rep. No. 91–1549, pp. 69–70 (1970)). Despite this broad language, Congress did not invoke its full authority under the Commerce Clause when it enacted § 844(i). *Jones v. United States*, 529 U.S. 848, 854, 120 S.Ct. 1904, 1909–10, 146 L.Ed.2d 902 (2000). Instead of requiring only that fire damage affect interstate commerce, Congress required that the damaged building itself be *used* in an activity that affects commerce. *Id.*

■ Because § 844(i) only applies to buildings *used* for activities affecting commerce, the Supreme Court requires courts to apply the two-prong "function test." *Jones*, 529 U.S. at 854, 120 S.Ct. at 1910. Under the first prong, the function of the

building must constitute "active," rather than "passive" activity affecting commerce. *Id.* at 856, 120 S.Ct. at 1911. Therefore, a private residence's passive use of services, even if they are interstate in character, does not subject the building to § 844(i). *Id.* at 855, 120 S.Ct. at 1910. Otherwise, practically every building that is constructed with supplies that have moved in interstate commerce, served by utilities that have an interstate connection, or financed or insured by enterprises that conduct business across state lines would be subject to the provision. *Id.* at 857, 120 S.Ct. at 1911. Section 844(i) simply does not extend so far.

■ Where a statute, like § 844(i), is susceptible to a broad construction that is of doubtful constitutionality, as well as a narrow construction that avoids constitutional implications, the narrow construction is required. *Jones,* 529 U.S. at 857, 120 S.Ct. at 1911. Accordingly, by requiring the first prong under the function test, which narrows § 844(i)'s application, the Court in *Jones* avoided the constitutional question that would arise if it read § 844(i) to be commensurate with Congress's full commerce power. Without the function test, § 844(i) makes the common-law crime of arson a matter for federal enforcement. *Id.* at 858, 120 S.Ct. at 1912. The Court stressed the importance of respecting constitutional principles preserving the dual nature of sovereignty in our system. *Id.* (*citing United States v. Bass,* 404 U.S. 336, 350, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971)). Without judicially enforced boundaries, federal regulation under the commerce power effectually obliterates the distinction between what is national and what is local. *NLRB v. Jones & Laughlin Steel,* 301 U.S. 1, 37, 57 S.Ct. 615, 81 L.Ed. 893 (1937); *United States v. Morrison,* 529 U.S. 598, 617–18, 120 S.Ct. 1740, 1754, 146 L.Ed.2d 658 (2000). This distinction is especially important in the present case, because it implicates arson, a paradigmatic common-law state crime. *Jones,* 529 U.S. at 857, 120 S.Ct. at 1911. A court should therefore refrain from upsetting the delicate federal-state balance unless congressional power clearly extends to the issue. *Bass,* 404 U.S. at 350, 92 S.Ct. at 523. Hence, the Court in *Jones* found applying the first prong of the function test to § 844(i) was in harmony with general rules of statutory construction. *Jones,* 529 U.S. at 857, 120 S.Ct. at 1911.

■ If a building is actively, rather than passively, being used for activities affecting commerce, the Court moves to the second prong of the function test to evaluate whether the building's function substantially affects commerce. In *United States v. Lopez,* 514 U.S. 549, 558, 115 S.Ct. 1624, 1629, 131 L.Ed.2d 626 (1995), the Supreme Court clarified what it means for an activity to "substantially affect commerce." Under its commerce power, Congress may regulate (1) the use of channels of interstate commerce; (2) instrumentalities of interstate commerce; and (3) those activities that substantially affect interstate commerce. *Lopez,* 514 U.S. at 558, 115 S.Ct. at 1629. In the present case, it is undisputed that SMBC neither served as a channel of interstate commerce, like a motel or a highway, nor as an instrumentality of interstate commerce, such as an airplane or vehicle. *See id.* (citations omitted.) Instead, the question is whether SMBC engaged in activities substantially affecting interstate commerce, for if it did, the property is covered by § 844(i). If SMBC's activities did not substantially affect commerce, however, then Defendant's indictment must be dismissed for lack of subject matter jurisdiction, as applying § 844(i) would be an unconstitutional extension of Congress's commerce power.

*United States v. Sherlin,* 67 F.3d 1208, 1213–14 (6th Cir.1995).

*Lopez* signaled a return to the principle that Congress's commerce power is rooted in the assumption that we have a single market and share a unified purpose to build a stable *national economy. Morrison,* 529 U.S. at 611, 120 S.Ct. at 1750,(citing *Lopez,* 514 U.S. at 573–74, 115 S.Ct. 1624, 131 L.Ed.2d 626 (Kennedy, J., concurring)) (emphasis added). Therefore, *Lopez* ushered in a renewed commitment to preserve the dichotomy between issues of local and national concern, and also between commercial and non-commercial activity. In *Lopez,* the Court overturned the Gun–Free School Zones Act of 1990. The Act not only regulated criminal activity which was traditionally a matter of local concern, it regulated activity that was *non-commercial. Lopez,* 514 U.S. at 550, 115 S.Ct. at 1625. Although this combination of attributes does not necessarily insulate such activity from Congress's reach, it did in *Lopez* where the government failed to show the non-commercial activity of carrying a weapon on school grounds substantially affected interstate commerce.

■ Congress's commerce power is fully extended when it reaches *commercial* activity that, in the *aggregate,* substantially affects interstate commerce. *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). In *Filburn,* the federal government regulated the consumption of home-grown wheat. The Supreme Court upheld the regulation, because such consumption constituted a substantial factor in the economics of the wheat market. Therefore, in evaluating *commercial* activity, the activity is viewed in light of similar activity across the nation. If that type of activity cumulatively has a substantial affect on the market, then it is subject to Congress's commerce power.

■ In contrast, *non-commercial* activity is treated more cautiously. For Congress to regulate non-commercial activity, such an activity, by *itself,* must implicate economic consequences that substantially affect commerce. Non-commercial activity may not be subjected to the aggregation principle. *Lopez,* 514 U.S. at 561, 115 S.Ct. at 1631; *Morrison,* 529 U.S. at 617, 120 S.Ct. at 1754.

Two lines of cases therefore emerge that are critical to the Court's analysis, the *Filburn* line and the *Lopez/Morrison* line of cases. As already mentioned, the *Filburn* line of cases represents the farthest reaches of congressional power under the commerce clause. Under *Filburn,* commercial activity, de minimus in nature, can be considered in light of similar activity on the national scale. Therefore, in *Filburn,* growing one's crops for personal use had a substantial affect on interstate commerce when aggregated on the national scale. In *Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 586, 117 S.Ct. 1590, 1603, 137 L.Ed.2d 852 (1997), the Court held that running a non-profit summer camp involved commercial activity, finding that interstate commercial activities of non-profit entities, as a class, were unquestionably significant to interstate commerce. Finally, to illustrate the point in the context of § 844(i), in *Russell,* the Supreme Court held that, though the activities of a small rental property did not impact the national economy, it was undisputed that the broader commercial market in rental properties substantially affected the national economy. *Russell,* 471 U.S. at 862, 105 S.Ct. at 2457.

In contrast, the *Lopez/Morrison* line of cases applies to non-commercial activity, and precludes aggregation. In *Morrison,* the Court overturned the Violence Against Women Act as an unconstitutional extension of Congress's commerce power. The

Court found that gender-based violence was non-commercial in nature. The Court recognized that, in the aggregate, violence against women may very well substantially affect the national economy. *Morrison,* 529 U.S. at 615, 120 S.Ct. at 1752 (citing H.R. Conf. Rep. No. 103–711, at 385, U.S.Code Cong. & Admin. News 1994, pp. 1803, 1853). For example, violence against women impedes their ability to participate in interstate commerce, diminishing national productivity, increasing medical costs, and decreasing the supply of and demand for interstate products. The Court, however, found that permitting Congress to regulate such activity would give Congress unrestricted power to regulate most any activity that has some attenuated effect upon interstate commerce. *Id.* The Commerce Clause is an enumerated power, and such an unfettered extension of power would be contrary to both the letter and the spirit of the Constitution. *Lopez,* 514 U.S. at 566, 115 S.Ct. at 1633.

Similarly, in *Lopez,* the Court found that concealing a weapon on school grounds was a non-commercial activity having little impact on the economy. The Court, however, did not preclude finding non-commercial activities subject to federal regulation under the commerce power. *Lopez,* 514 U.S. at 562, 115 S.Ct. at 1631. For example, the Court noted that the Gun–Free School Zone Act did not have an express jurisdictional element that limited its reach to a discrete set of firearm possessions that have an explicit connection with or effect on interstate commerce. *Id.* Accordingly, for Congress to regulate a non-commercial activity under its commerce power, the non-commercial activity must, by itself, substantially affect commerce.

The distinction between non-commercial and commercial activity is not always clear. *Lopez,* 514 U.S. at 566, 115 S.Ct. at 1633. Conduct in our highly interdependent economy ultimately has a commercial consequence. *Morrison,* 529 U.S. at 611, 120 S.Ct. at 1750. However, the distinction is necessary to preserve the distinction between national and local spheres of power, and to maintain principled boundaries around Congress's commerce power. *Id.,* at 617–18, 120 S.Ct. at 1754; *Lopez,* 514 U.S. at 566, 115 S.Ct. at 1633.

■ Accordingly, with these principles in mind, in deciding whether SMBC is covered by § 844(i), the Court must (1) discern the function of the SMBC's building; and, if appropriate, (2) evaluate whether that function substantially affects interstate commerce.

A. *First Prong: separating passive activity from active activity*

■ Certain of SMBC's activities are passive in nature. The church owns four vehicles. It may have purchased these vehicles, but it does not engage in the commercial activity of selling vehicles, or any other goods for that matter. That SMBC purchased four vehicles is no different than the individual homeowner who purchases vehicles for family members. Plaintiff argues that, in building the SMBC facilities, contractors inevitably used out-of-state supplies. Similarly, SMBC's mortgage and insurance coverage may have interstate characteristics. The workers SMBC pays to maintain its premises may reside in Arkansas or Mississippi. However, these transactions have no bearing on SMBC's actual function. In fact, these are the type of passive activities expressly rejected by the court in *Jones,* 529 U.S. at 857, 120 S.Ct. at 1911. SMBC is subject to § 844(i) only if it actively engaged in activities that substantially affect interstate commerce.

B. *Second Prong: whether SMBC engages in activities affecting interstate commerce*

Some of SMBC's activities are active in nature. SMBC provides worship services, sponsors gospel programs, and hosts picnics and breakfast buffets. In determining whether these activities substantially affect interstate commerce, the Court adheres to previously mentioned principles, (1) respect for the separate areas of national and local concern, *Jones & Laughlin Steel,* 301 U.S. at 37, 57 S.Ct. at 624; *United States v. Morrison,* 529 U.S. at 617–18, 120 S.Ct. at 1754; and (2) caution in allowing federal regulation of non-commercial activity.

▋ Plaintiff asserts that church activities, under *United States v. Grassie,* 237 F.3d 1199 (10th Cir.2001), are subject to Congress's commerce power. In *Grassie,* the Tenth Circuit held that § 844(i) applied to the arson of the Church of Latter Day Saints ("LDS") in the town of Roswell in New Mexico. Although *Grassie* is helpful in evaluating the present case, this Court notes that circumstances in *Grassie* were fundamentally different. In *Grassie,* the parties *stipulated* that LDS Roswell had been "engaging in activities affecting interstate commerce." *Grassie,* 237 F.3d at 1208. *Grassie* was on appeal to the circuit court, and the appellate standard of review favored the prevailing party, the government. Accordingly, the Tenth Circuit construed the word "engaging" to mean "active." Interpreting the facts in the government's favor, the court in *Grassie* therefore found *all* of the church's activities, including what this Court would consider passive activity, to be considered "active" activity. Unlike in *Grassie,* in the present case there is no such stipulation of facts, and the Court does not read the facts in either party's favor. As previously discussed, this Court has found SMBC's activities to be largely passive in nature,

and, failing to satisfy the first prong of the function test, not within Congress's power to regulate under the Commerce Clause. The next question is whether SMBC's "active" activities were commercial or non-commercial in nature. The Court finds SMBC's active activities, its radio broadcasts, its picnics, and its gospel programs, to be non-commercial in nature.

SMBC is a church. Its main function is to facilitate worship, and is therefore used for non-commercial activities. Unlike a manufacturer, or a retailer, SMBC is not engaged in the production or the selling of goods. The Supreme Court has held that a church *camp* provides commercial services because it provided recreational services. *Camps,* 520 U.S. at 572, 117 S.Ct. at 1596. In the present case, however, SMBC's activities are all integral to worshiping. Tithing is necessary to sustaining worship services and rooted in the Christian doctrine. SMBC's radio programs do not sell goods or services, but instead broadcast its sermons. It's gospel programs, although in one sense entertainment, are also worship-centered and part of the ministry of the church. Therefore, the Court finds that SMBC's buildings were used for non-commercial activities. The Court acknowledges that these non-commercial functions have economic consequences interstate in nature. However, in today's society, it is difficult to fathom a situation that would not have some interstate nexus. Therefore, to categorize the church's activities that tend to congregants' spiritual needs a commercial enterprise would be to obliterate the distinction between commercial and non-commercial activity, a distinction that *Lopez* explicitly sought to maintain.

Plaintiff correctly points out that, in *Grassie,* the court applied § 844(i) to LDS Roswell, even though the church participated in mostly non-commercial activities. Critical to the court's conclusion, besides

the aforementioned stipulation of facts, was the church's organization. LDS Roswell was not an autonomous church that merely belonged to a broader association. Instead, the court in *Grassie* found that LDS Roswell was part and parcel of a unified, national LDS organization. Though LDS engaged in mostly non-commercial activities, as a unit, LDS operated a multi-million dollar organization that substantially affected interstate activity. Likewise, an autonomous church engaging in non-commercial activity could be subject to congressional regulation under the commerce power if its operations were extensive enough to substantially impact interstate commerce. However, SMBC is not one of those churches.

Plaintiff has not shown the Court that SMBC's radio broadcasts, gospel programs, or picnics are anything but minor church centered events largely intrastate in scope. In 1997, about $15,000 was spent on radio related activities, $3,500 for food and flowers used at funerals, and $5,500 on groceries for picnic and breakfast buffet functions. The level of SMBC's operation, and its subsequent impact on interstate commerce, is just too de minimus to substantially impact interstate commerce. SMBC is not like LDS of Roswell, which is a satellite of a unified and multimillion dollar operation. Although the line defining whether or not activities substantially affect interstate commerce is uncertain, SMBC's activities do not fall within a gray area. SMBC's activities undisputably have a minor affect on the national economy, more akin to the economic impact of a household on interstate commerce.

The radio programs and advertisements have not been shown to be for selling goods or providing services. The programs were not commercial but religious in nature, and any advertisements related to SMBC's future worship events. SMBC's non-commercial activities have only a de minimus effect on interstate commerce, insufficient to bring SMBC within the ambit of federal regulation under the Commerce Clause. *Lopez*, 514 U.S. at 558, 115 S.Ct at 1629. To subject SMBC to federal regulation, in such circumstances, would disturb the established and constitutionally mandated balance between national and local spheres of influence.

Plaintiff's final argument that Defendant used the premises to generate income for himself is unavailing. There is no evidence that Defendant conducted any business from SMBC's premises. The Court finds, therefore, that it lacks subject matter jurisdiction to hear the case, and dismisses the § 844(i) charge. Defendant's motion for reconsideration is **DENIED**.

### III. Order

For the reasons herein, the Court **DENIES** Defendant's motion to reconsider its August 25, 2000 Order dismissing Defendant Gerald Rayborn's indictment for arson under 18 U.S.C. § 844(i).