[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 21, 2002
THOMAS K. KAHN
CLERK

————————————

Nos. 01-14872 and 01-15080

————————————

D. C. No. 99-00026-CR-01-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAY SCOTT BALLINGER,

Defendant-Appellant.

————————————

Appeals from the United States District Court
Northern District of Georgia

————————————

**(November 21, 2002)**

Before BIRCH, HILL and HALL*, Circuit Judges.

———————————
*Honorable Cynthia Holcomb Hall, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

HILL, Circuit Judge:

Jay Scott Ballinger pled guilty to four counts of church arson in violation of 18 U.S.C. § 247(a)(1). He also pled guilty to one count providing for enhanced penalties for violation of the statute "if death results from [the defendant's] acts," 18 U.S.C. § 247 (d)(1) or "if bodily injury results to any person . . . and the violation is by means of fire . . . ." 18 U.S.C. § 247 (d)(2). Pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, Ballinger conditioned his plea upon a judicial determination of the constitutionality of § 247, both on its face and as applied to him. The district court upheld the constitutionality of the statue in both respects, and this appeal followed.

## I.

The district court recited the following facts, stipulated to by Jay Scott Ballinger and the government, as relevant to the constitutional issues. Jay Scott Ballinger deliberately set fire to five churches in the Northern and Middle Districts of Georgia between December 22, 1998, and January 16, 1999. Ballinger's fires completely destroyed the Amazing Grace Baptist Church in Chatsworth, Georgia ("Amazing Grace"), the New Salem United Methodist Church in Commerce, Georgia ("New Salem"), and the fellowship hall of the Sardis Full Gospel Church in Monroe, Georgia ("Sardis Full Gospel"). The New Salem fire resulted in the death of one volunteer firefighter and bodily injury to three other firefighters.

Ballinger's two additional fires badly damaged the Johnson United Methodist Church in Watkinsville, Georgia ("Johnson United") and the fellowship hall of the Mountain View Baptist Church in Chatsworth, Georgia ("Mountain View").

Prior to its destruction, Amazing Grace had purchased song books from Knoxville, Tennessee, pew coverings and hymnals from Cleveland, Tennessee, and fund-raising supplies (candy) from Montgomery, Alabama. Its 300-member congregation, some of whom resided in neighboring Tennessee, had recently purchased the church building and one acre of land from the North Georgia Conference of the United Methodist Church, headquartered in Evanston, Illinois. To finance this acquisition and repair storm damage, the congregation held yard sales, bake sales, and sold cookbooks. The congregation commissioned the printing of these cookbooks in Collierville, Tennessee. Amazing Grace also collected donations for the poor, some of which were provided to needy travelers in the form of food, household items, and hotel or motel lodging.

Mountain View, a 372-member congregation, had acquired Bible school materials from California, building supplies from Alabama and other out-of-state vendors, and plumbing and electrical supplies from Collierville, Tennessee. The church belonged to the 14-member Coosawattee Baptist Association and donated money to the Georgia Baptist Children's Home, which provided housing, clothing,

3

food, and classroom instruction to foreign children intercepted by the United States Immigration and Naturalization Service, as well as children from other domestic states. In 1998, Mountain View donated $1,536 in such funds. The church contributed an additional $1,536 to Georgia Baptist Hospital's indigent-care fund which, in part, provided medical services to children whom its doctors brought to Georgia from the Dominican Republic, Russia, and various South American countries. At the time of the fire, at least one of Mountain View's members was living out-of-state; this member was serving in the United States military but returned to the church while on leave. Mountain View also used a fifteen-passenger van shipped from Orlando, Florida to transport its youth choir and elderly women's groups.

Sardis Full Gospel, a 60-member congregation, regularly held week-long revivals, hosting visiting pastors from Canada, Florida, Mississippi, Ohio, and South Carolina. These out-of-state pastors would either stay with church members, in a local hotel, or in the church itself, which was equipped with showers and sleeping facilities. Further, the congregation prepared and served meals to the visiting pastors in its fellowship hall, which defendant destroyed on December 25, 1998. The church had also acquired, via donation, a fax machine/copier from Panasonic, Inc., a donation that was approved by the company's New Jersey

headquarters.

Like Amazing Grace, New Salem was a member of the North Georgia Conference of the United Methodist Church, whose national headquarters were in Evanston, Illinois. Through this conference, New Salem, which had roughly 120 members at the time of its destruction, regularly sent money to the national office. The national office used these funds for a variety of purposes, including foreign and domestic missions. To subsidize its pastor's pension, New Salem also contributed, through the conference, to the Illinois-based pension administrator. The church property itself was held in trust for the General Conference of the United Methodist Church in Illinois.

Prior to its destruction, New Salem had acquired office supplies from Ottawa, Illinois; Bible school materials from Grandview, Missouri; banners from Nashville, Tennessee; church bulletin and newsletter-making materials from Canton, Ohio; and a steeple from Alabama. The congregation had several out-of-state members and several out-of-state recipients of its monthly newsletters. To finance youth group trips and outings, including trips to Orlando, Florida and Chattanooga, Tennessee, New Salem members held fund-raising barbeques, bake sales, car washes and sold candy.

Johnson United, a 132-member congregation, also belonged to the North

Georgia Conference of the Evanston, Illinois-based United Methodist Church, to which it regularly sent monetary apportionments. Like New Salem, Johnson United subsidized its pastor's pension plan and health insurance by contributing, through the conference, to the United Methodist Church's General Board of Pension and Health Benefits. The church property itself was held in trust for the General Conference of the United Methodist Church in Illinois. Several of Johnson United's members lived in other states, including Illinois, yet continued to attend services. Additionally, the congregation purchased Sunday school and Bible school materials from Nashville, Tennessee; Boy Scout and Girl Scout troops used the church for meetings; and the church served as a voting precinct for citizens in its district.

All five of the damaged or destroyed churches received annual visits from the Nashville, Tennessee-based Gideon Bible Ministry, which conducted worship services and collected monetary donations used for placing Bibles throughout the United States and in 175 different countries. Further, all five of the churches purchased all of their propane gas from out-of-state suppliers, though local services delivered it. Mountain View was also insured by an out-of-state carrier, Church Mutual Insurance Company of Wisconsin.

Finally, the parties agreed that Ballinger and his girlfriend, Angela Wood,

traveled in interstate commerce to commit the arsons, purchasing goods and services en route, including the gasoline used to start the fires.[1]

## II.

Title 18 U.S.C. § 247(a)(1) provides that whoever "intentionally defaces, damages, or destroys any religious real property, because of the religious character of that property, or attempts to do so" is guilty of a federal crime.[2]  Ballinger concedes that he committed the church arsons with which he was charged, but contends that the district court should have, nevertheless, dismissed the indictments[3] against him because § 247 is unconstitutional both on its face, and as applied to him.  We review these issues of law *de novo*.  *United States v. Scott*, 263 F.3d 1270, 1271 (11th Cir. 2001).

### A.    **The Facial Challenge**

Ballinger claims that the statute is unconstitutional on its face because its enactment exceeded Congress' authority under the Commerce Clause.  We disagree.

---

[1]Ballinger and Wood traveled to Georgia from Indiana.  On their way back, they committed three additional church arsons.

[2]If these acts result in a death, conviction may result in life imprisonment or execution. 18 U.S.C. § 247(d)(1).  One of Ballinger's arsons did result in a death, and he has been sentenced to life imprisonment on that count.  He received concurrent twenty-year sentences on the remaining counts.

[3]Ballinger was charged in two separate indictments.

7

Congress' authority under the Commerce Clause extends to the regulation of activities which are in or affect interstate commerce. *United States v. Lopez*, 514 U.S. 549, 559 (1995). Congress included within § 247 a jurisdictional element which expressly requires the government to prove this interstate commerce nexus. 18 U.S.C. § 247( b). The statute applies only when "the offense is in or affects interstate or foreign commerce." *Id.* In the absence of sufficient proof of the interstate commerce connection, the statute does not apply to the arson charged. *Id.* We have previously held that a statute enacted under the Commerce Clause is constitutional on its face if it contains a jurisdictional element that "ensure[s], through case-by-case inquiry, that the activity in question affects interstate commerce." *United States v. Cunningham*, 161 F.3d 1343, 1346 (11th Cir. 1998) (quoting *Lopez*, 514 U.S. at 562). We conclude, therefore, that Congress did not exceed its authority under the Commerce Clause when it enacted 18 U.S. C. § 247, and the statute is constitutional on its face. Accordingly, we have jurisdiction to determine whether the statute was applied constitutionally to Ballinger.

## B.    The "As Applied" Claim

Ballinger claims that § 247 does not apply to the acts for which he was convicted, namely the arson of five small, rural churches in Georgia, because there was an insufficient connection between these arsons and interstate commerce, as

8

required by the Constitution.  If so, the Constitution forbids the application of the statute to him.

We must decide all statutory issues, however, before addressing constitutional ones.  *United States v. Odom*, 252 F.3d 1289, 1293 (11th Cir. 2001) ("A fundamental and longstanding principle of judicial restraint requires that a court avoid reaching constitutional questions in advance of the necessity of deciding them") (citing *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988)).  Since § 247contains an express jurisdictional element requiring that the charged arson be "in or affect interstate commerce," whether the statute applies to Ballinger's arsons, is, in the first instance, an issue of statutory interpretation.  We must decide what burden the jurisdictional element of § 247 places upon the government, and whether the government met this burden.  If the government did so, then and only then, should we address any remaining constitutional issues.

1.    *The "Offense Is In or Affects Interstate Commerce"*

Section 247(b) extends federal jurisdiction to the arson of religious real property when the "offense is in or affects interstate commerce."  Ballinger contends that this language requires the government to prove that his arsons had a *substantial* effect on interstate commerce.  The government contends that by using

these words Congress intended to invoke its full power under the Commerce Clause, so that even a *de minimis* connection between Ballinger's arsons and interstate commerce satisfies the statute. As we have not previously construed the jurisdictional element of § 247, this is an issue of first impression in this circuit.

Under the authority of the Commerce Clause, Congress may always regulate the *instrumentalities* and the use of the *channels* of interstate commerce. *Lopez*, 514 U.S. at 558-59. The instrumentalities of interstate commerce are those "*persons or things*" that *move* in interstate commerce, including all cars and trucks, ships, aircraft and anything else that travels across state lines, as do interstate shipments. *Id.* The channels of interstate commerce include interstate highways, shipping lanes, rivers, lakes, canals, railroad track systems, the mail, telegraph lines, air traffic routes electronic and all other *modes of interstate or foreign movement* of commerce. *Id.* The instrumentalities and channels of interstate commerce encompass the concept of movement of commerce across state lines, and there has never been any serious question about Congress' authority to regulate and protect them. *Id.*

Arson, however, is a an *activity*. Furthermore, it is a purely *intrastate* activity. Therefore, it is neither an instrumentality nor a channel of interstate commerce. For a long time in our jurisprudence, congressional authority to

10

regulate such intrastate activities was not recognized by the Supreme Court.

*United States v. E.C. Knight Co.*, 156 U.S. 1, 12 (1895) ("Commerce succeeds to manufacture and is not part of it").  Later, the Court recognized the necessity to protect interstate commerce from the burdens and obstructions that might be imposed by intrastate activities that have a "close and substantial relation" to it.

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937).  Under such circumstances, the Court held, the regulation of intrastate activities that "affect" interstate commerce is within Congress' commerce power.  *Id.* at 37.

Recently, the Court has acknowledged that, within this last category of regulation, its "case law has not been clear whether an activity must 'affect' or 'substantially affect' interstate commerce in order to be within Congress' power to regulate it under the Commerce Clause." *Lopez*, 514 U.S. at 559.  The Court concluded, however, that the "great weight" of its decisions make clear that a "substantial effect" on  interstate commerce is constitutionally required.  *Id.  See also United States v. Robertson*, 514 U.S. 669, 671 (1995) ("[t]he 'affecting commerce' test . . . define[s] the extent of Congress's power over purely *intra* state commercial activities that nonetheless have substantial *inter* state effects") (emphasis in original)).

Thus, Congress' power to regulate intrastate activities is more limited than is

its power to regulate the instrumentalities and channels of interstate commerce. Whereas Congress may regulate *any* instrumentality or channel of interstate commerce, the Constitution permits Congress to regulate only those intrastate activities which have a *substantial* effect on interstate commerce, and such regulation of purely intrastate activity reaches the outer limits of Congress' commerce power.

To hold otherwise, the Court noted, would "convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567. This the Constitution does not permit. *Id.*; *see also Maryland v. Wirtz*, 392 U.S. 183, 197, n. 27 (1968) (the Constitution does not permit Congress to use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities).

It is in this sense that the government is correct when it says that § 247(b)'s punishment of church arsons that "affect" interstate commerce invokes Congress' full power under the Commerce Clause. Such regulation of a purely intrastate activity – arson – invokes Congress' full authority under the Commerce Clause not because it may, but because it *must*.

The talismanic repetition over the years of the phrase "fullest extent" of congressional commerce power has led some to confuse this concept of the outer

12

*limits* of congressional authority for an independent grant of authority. Somewhere along our jurisprudential way, the mantra developed that "*de minimis*" effects are sufficient when Congress invokes its "full authority" through regulation of an activity "in or affecting" interstate commerce. In fact, just the opposite is true. When Congress pushes its commerce power to its constitutional limit by seeking to regulate a purely intrastate activity, only a *substantial* effect on interstate commerce by that activity will do.

Perhaps this confusion springs from a failure to distinguish between regulation of *economic* as opposed to *non-economic* activity. When the regulated intrastate activity is a commercial or economic one, the Constitution permits the required substantial effect on interstate commerce to be located in the *aggregate* impact of the regulated activity upon interstate commerce. *Wickard v. Filburn*, 317 U.S. 111 (1942). The Court has held that "where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Wirtz*, 392 at 197, n. 27. The Constitution permits such aggregation of effects to justify congressional regulation of purely intrastate economic activity when the absence of such regulation would undercut a larger regulatory scheme affecting interstate commerce. *Lopez*, 514 U.S. at 561.

13

No such aggregation of local effects is constitutionally permissible in reviewing congressional regulation of intrastate, *non-economic* activity. *United States v. Morrison*, 529 U.S. 598, 617 (2000). Where such regulation is at issue, the Constitution requires that the activity, by *itself*, have economic consequences that *substantially affect* interstate commerce. *Lopez*, 514 U.S. at 561. No aggregation of local effects is permissible to elevate a non-economic activity's insubstantial effect on interstate commerce into a substantial one in order to support federal jurisdiction. *Id.*

This is especially true when Congress seeks to federalize common-law state crimes. *Morrison*, 529 U.S. at 617. In *Morrison*, the Court explicitly "reject[ed] the argument that Congress may regulate non-economic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.*[4] The Court made clear that "a fair reading of *Lopez* shows that the non-economic, criminal nature of the conduct at issue was central to our [rejection of such regulation] in that case." *Id.* at 610.[5] Recently, we have recognized and applied

---

[4]In *Morrison*, the Court held the civil remedy provision fo the Violence Against Women Act an unconstitutional exercise of Congress' commerce power. The Court found that gender-based violence is a non-economic, purely intrastate crime, without a substantial effect on interstate commerce, that Congress is without power to regulate.

[5]In *Lopez*, the Court held that Congress exceeded its authority when it criminalized the knowing possession of a firearm in a school zone because this activity is not in commerce, nor does it substantially affect interstate commerce. 514 U.S. at 567-68.

the Court's clarification of this distinction. *United States v. Gray*, 260 F.3d 1267, 1273-74 (11th Cir. 2001) (reaffirming that a *de minimis* effect is sufficient under Hobbs Act because "the Supreme Court's rejection of an aggregation theory" for regulation of *non-economic* activity is "wholly inapposite" to Hobbs Act which "plainly and undeniably regulates economic activity").[6]

To allow Congress to regulate local crime on a theory of its aggregate effect on the national economy would give Congress a free hand to regulate any activity, since, in the modern world, virtually all crimes have at least some attenuated impact on the national economy. *Morrison*, 529 U.S. at 615. Furthermore, it would transfer to Congress a general police power that the Constitution denies the federal government and reposes in the states. *Id.* at 618 ("The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved interstate commerce has always been the province of the States).

---

[6]In the only reported appellate interpretation of § 247, the Tenth Circuit appears to have overlooked this distinction. *United States v. Grassie*, 237 F.3d 1199, 1209 (10th Cir. 2001). Although the interstate commerce nexus was stipulated to in that case, the court nonetheless upheld a jury instruction requiring the government to prove only a *de minimis* effect on interstate commerce by the church arson. The court predicated its decision upon the fact that § 247's jurisdictional element triggers the "fullest reach" of Congress' commerce power. *Id.* The presence of a jurisdictional element, however, preserves the constitutionality of the statute only so long as that element requires a constitutionally adequate modicum of proof. *Odom*, 252 F.3d at 1296.

15

We conclude that § 247 regulates the *activity* of arson and applies to the church arson, which, by *itself*, *substantially affects* interstate commerce. *See Lopez*, 514 U.S. at 559-61; *Morrison*, 529 U.S. at 617.

We find support for our conclusion in two recent decisions rejecting the government's expansive view of Congress' authority to regulate local, non-economic, criminal activities. In *Jones v. United States*, 529 U.S. 848, 859 (2000), the Court was called upon to interpret the federal omnibus arson statute, 18 U.S.C. § 844, which extends federal jurisdiction over the burning of any real property "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce."

The government, seeking to prosecute the arson of an owner-occupied, private residence, invoked the mantra that Congress' use of the words "affecting" interstate commerce signaled Congress' intent to exercise its full authority under the Commerce Clause. The Court, however, held that the receipt of natural gas, a mortgage and an insurance policy from out-of-state were insufficient to establish that the residence was used in an activity affecting interstate commerce. *Id.* at 857. The Court rejected these connections as too *de minimis*, holding that § 844 "does not reach an owner-occupied residence that is not used for any commercial purpose." *Id.* "Given the concerns brought to the fore in *Lopez*," the Court wrote,

"it is appropriate to avoid the constitutional question that would arise were we to read § 844(i) to render the 'traditionally local criminal conduct' in which petitioner Jones engaged 'a matter for federal enforcement.'" *Id.* at 858. (quoting *United States v. Bass*, 404 U.S. 336, 350 (1971)).[7] The Court concluded that § 844 is not "soundly read to made virtually every arson in the country a federal offense." *Id.*

In *Odom*, we too were asked to interpret the constitutional reach of § 844. The government sought to apply the statue to the arson of a church. As did the *Jones* Court, we asked first whether § 844 could ever apply to the arson of such property. Unlike the private residence in *Jones*, however, we recognized that, although a church is not ordinarily considered a business enterprise, "churches can and do engage in commerce." *Id.* at 1294.

Since § 844 *might* apply to a church, we were required to determine what quantum of interstate commerce connection would satisfy the statute's jurisdiction element. We observed, first, that, in view of *Lopez* and *Morrison*, the "mere engagement in commercial activities may not necessarily provide the requisite nexus between the function of the [church] and interstate commerce." *Id*. at 1295. In order to avoid the constitutional problem that would arise were § 844(i)

---

[7]In construing the statute not to reach the arson of a purely private residence, the Court avoided Jones' constitutional claim that criminalization of such an arson is beyond the commerce power of Congress.  529 U.S. at 852.

interpreted to apply to criminal conduct *without* a sufficient interstate commerce nexus, we concluded that its jurisdictional element had to be construed in accord with the requirements of the Commerce Clause, as explained in *Lopez*, *Morrison*, and *Jones*. *Id.* Thus, we held that § 844 requires the government to prove that the burned church's activities had a "substantial effect" on interstate commerce." *Id.* at 1297. We said:

> Allowing the government to meet the interstate commerce requirement through only a nominal showing of a connection to interstate commerce would do as much to 'completely obliterate' the distinction between national and local authority as if no jurisdictional requirement existed at all. The presence of a jurisdictional element may preserve the constitutionality of the statute so long as a case-by-case analysis requires *sufficient* proof of a connection to interstate commerce. Otherwise, Congress could circumvent the requirement of the constitution's interstate commerce clause by inserting a jurisdictional element into every statute and allowing the government to rely on the most minimal proof of that element. (emphasis added)

*Id.* at 1296 (citations omitted).

We also rejected the government's argument that it could rely on the aggregate effect on interstate commerce of local church arsons in order to justify federal jurisdiction under § 844. *Id.* at 1297. We held that "the *Morrison* court clearly rejected Congress' ability to 'regulate [non-economic criminal ] conduct based solely on that conduct's aggregate effect on interstate commerce.'" *Id.*

After reviewing the evidence, we concluded that "[t]he Government has

18

failed to set forth sufficient evidence establishing that St. Joseph's Baptist Church, the building destroyed by Defendants' act of arson, was used in or affected interstate commerce according to the requirements of § 844(i)," and we reversed the defendants' convicitions. *Id.*

As we did with § 844, we have avoided construing § 247's jurisdictional element in a way that would bring it into conflict the Constitution. Since the Constitution requires a substantial interstate commerce nexus before Congress can regulate an intrastate activity, § 247(b) requires the government to prove that *each* of Ballinger's church arsons had a *substantial* effect on interstate commerce.

The dissent disagrees. The dissent asserts that § 247 prohibits not only the arson of a church, but also "travel for the purpose of committing [church] arson," thereby falling within Congress' authority to regulate the *channels* of interstate commerce. We disagree for two reasons.

First, this is not what the statute says. Although it could easily have done so, the statute does not prohibit travel, or the use of any of the channels of interstate commerce, to commit a church arson.[8] In fact, when Congress amended the statute

___

[8]There are numerous federal statutes which do, explicitly, forbid movement in interstate commerce in order to commit a traditional common-law crime. *See, e.g.,* 18 U.S.C. § 43 (traveling to engage in animal terrorism; 18 U.S.C. § 228 (traveling to avoid paying child support); 18 U.S.C. § 1073 (flight to avoid prosecution); 19 U.S.C. § 1074 (flight to avoid prosecution for destroying property); 18 U.S.C. § 1231 (interstate travel to engage in strikebreaking); 18 U.S.C. § 1958 (traveling to engage in murder for hire); 18 U.S.C. § 2101

19

in 1996, it specifically *removed* all reference to travel to commit the arson as a jurisdictional predicate for § 247. Prior to that time, the statute had prohibited the destruction of a church when "in committing the offense, the defendant travels in interstate or foreign commerce, or uses a facility or instrumentality of interstate or foreign commerce . . .". Pub. L. No. 100-346, § 1, 102 Stat 644 (1988). After amendment, the statute prohibits church arson when the "offense is in or affects interstate or foreign commerce". The plain language of § 247 now does not provide for travel in interstate commerce as a basis for federal jurisdiction.

Recognizing that the statute lacks any reference to interstate travel to commit the crime, the dissent argues that this language should be read into the definition of the "offense" criminalized by § 247. Thus, travel to commit church arson would be part of the *offense*, placing that offense "in" the channels of interstate commerce.

The difficulty with this argument is that the statute does not say this either, defining the offense solely as the "damage, defacement or destruction" of a church. 18 U.S.C. § 247(a)(1). Nevertheless, the dissent argues that the meaning of

---

(traveling to cause a riot); 18 U.S.C. § 2118 (traveling to engage in robbery involving controlled substances); 18 U.S.C. § 2261 (traveling to commit interstate domestic violence); 18 U.S.C. § 2261A (traveling to commit interstate stalking); 18 U.S.C. § 2262 (traveling to violate domestic protective order); 18 U.S.C. § 2423 (interstate travel to provide minors for sex). These statutes regulate crime by focusing on the criminal's movement in the channels of interstate commerce.

"offense" in the statute is "ambiguous" and can be made clear by reference to the legislative history. In this history, the House Committee Report does refer to "interstate travel to commit, plan, or prepare to commit" a church arson as satisfying the statute. 1996 U.S.C.C.A.N. 1082, 1087-88. The dissent urges that the offense, defined by the statute as the "damage, defacement or destruction" of a church, should be read to include this interstate travel gloss from the legislative history.

In interpreting § 247, it is our duty to give effect to the intent of Congress. To divine that intent, however, we must first look to the language of the statute. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). In interpreting this language, the Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* at 254 (citations omitted). "When the words of a statute are unambiguous, then, this first canon [of construction] is also the last: 'judicial inquiry is complete.'" *Id.* (citation omitted).

The Court has also considered and rejected the argument that the plain meaning of a statute is undermined if the "legislative history points to a different result." *Id.* To the contrary, judicial inquiry into the applicability of the plain words of a statute "begins and ends with what [the statute] does say and with what

21

[it] does not." *Id.* (referring to interplay between two different statutes). *See also United States v. Barlow*, 41 F.3d 935, 942 (5th Cir. 1994) (applying these canons of construction to the earlier version of § 247).

In effect, the dissent wants this court to repeal the 1996 amendment and reinsert the deleted statutory language targeting interstate travel. However appealing, we cannot do this. If Congress wants the statute to prohibit travel in the channels of interstate commerce to commit arson, then it may say so, just as it has done in the statutes cited earlier. Since, however, the statute does not so define the offense, we must adhere to the statute as written and may not supply the missing language. *West Virginia University Hospitals, Inc. v. Casey,* 499 U.S. 83, 98-99 (1991) (reversed on other grounds) (plain statutory language not to be expanded or contracted by statements of individual legislators or committees during enactment process); *Union Bank v. Wolas*, 502 U.S. 151 (1991) (failure to foresee all the consequences of a statutory enactment is insufficient reason for refusing to give effect to the statute's plain language). For now, federal jurisdiction under § 247 cannot be predicated upon the defendant having traveled in interstate commerce.[9]

---

[9]While we agree with the dissent that some proponents of the 1996 amendment thought they were broadening the jurisdictional scope of § 247 by insertion of the "in or affects" interstate commerce requirement, thereby applying it to purely *intrastate activity* [church arson] which *affects* interstate commerce, a category of regulation still thought to be virtually unlimited at the time the amendment was adopted, we do not agree with the dissent that they achieved this result. Congress did not know then that, less than four years later, the Supreme Court would

22

The only issue remaining in this case is whether the stipulated facts were sufficient to establish that each of Ballinger's arsons had a substantial effect on interstate commerce. If not, the trial court should not have accepted Ballinger's guilty plea and entered a judgment of guilty.

2.  *The Sufficiency of the Evidence*

The arson of a church has a substantial effect on interstate commerce if its activities prior to the arson substantially affected interstate commerce and the arson of that church terminated those activities. The final issue in this case, then, is whether each of these churches' activities substantially affected interstate commerce.

The government argues that the stipulated facts recited above attest to the many and varied connections between these churches and interstate commerce. The problem with this argument, however, is that we have previously rejected many of these connections as insufficient to establish the requisite substantial effect.

In *Odom*, we specifically considered many of these same putative interstate

---

hold that in order to regulate a non-economic activity, such as the crime of arson, the activity, standing alone, must have a substantial effect on interstate commerce. *Morrison*, 529 U.S. at 610. Ironically, by redefining § 247 to require that the offense affect interstate commerce and simultaneously deleting the statutory language predicating federal jurisdiction upon interstate travel to commit the offense, Congress effectively narrowed § 247's jurisdictional reach.

connections: donations from out-of-state donors; use of Bibles and prayer books that were purchased from out-of-state vendors; and contributions to out-of-state church organizations through membership in intrastate church organizations. We held that "[t]hese 'connections' to interstate commerce are too passive, too minimal and too indirect to substantially affect interstate commerce." 252 F.3d at 1297.

The Fifth Circuit has also rejected some of the government's other theories of the interstate connection in this case: membership in an intrastate church organization that contributed financially to the national church organization that then redistributes the money throughout the world; receipt of insurance proceeds from an out-of-state insurer. *United States v. Johnson*, 246 F.3d 749, 752 (5th Cir. 2001). These connections were not substantial enough to provide factual support for a guilty plea. *Id.*

Similarly, in *United States v. Rea*, the Eight Circuit held that the church's use of materials and natural gas purchased in interstate commerce were insufficient to prove the requisite effect on interstate commerce. 223 F.3d 741 (8th Cir. 2001).

At least one district court has found connections similar to those posited here to be insufficient. *United States v. Rayborn*, 138 F. Supp. 2d 1029, 1036 (W.D. Tenn. 2001) (money spent on goods and services including radio broadcasts, food,

24

flowers, and groceries).

The only remaining evidence of an interstate connection offered by the government is attendance at the churches by out-of-state members and hosting of out-of-state guests such as visiting pastors.  The dissent argues that the provision of spiritual services to out-of-state members and guests "demonstrates active employment in interstate commerce."  Although we did say in *Odom* that the "business" of a church might involve the provision of spiritual services,[10] these out-of-state memberships, like the churches' other connections to interstate commerce, are too insubstantial to support federal jurisdiction. At most, the evidence was that three of the five churches had some out-of-state members.  One of these had only one such member – a military man whose permanent residence was in-state.  Of the other two, the evidence was only that they had "some" out-of-state members.  These memberships do not substantially affect interstate commerce.

---

[10]In *Rayborn*, the court took the position that:
> [T]hese non-commercial functions have economic consequences interstate in nature.  However, in today's society, it is difficult to fathom a situation that would not have some interstate nexus.  Therefore, to categorize the church's activities that tend to congregant's *spiritual* needs a commercial enterprise would be to obliterate the distinction between commercial and non-commercial activity, a distinction that *Lopez* explicitly sought to maintain. (emphasis added)

*Id.* at 1035.

Taken separately, the connections of each church to interstate commerce are too insubstantial to satisfy the jurisdictional element of § 247. Nor can we aggregate the effects of all five arsons in order to reach the level of effect on interstate commerce required by the statute. *Morrison*, 529 U.S. at 617; *Odom*, 252 F.3d at 1297. Although the destruction of these churches undoubtedly had economic consequences, the mere existence of such consequences does not trigger § 247. While Ballinger's crimes are heinous, they are state crimes. To allow the government to prosecute him for these arsons would be to obliterate the distinction between national and local authority that undergirds our federal system of government. *Lopez*, 529 U.S. at 617-18.

We hold, therefore, that § 247 does not apply to Ballinger's arsons.[11]

## III.

Section 247 requires proof of a substantial affect on interstate commerce by each charged church arson. That proof being insufficient in this case, Ballinger's convictions are reversed.

REVERSED AND REMANDED.

---

[11]That is not to say, and we do not decide, that there may never be a church whose activities have the required substantial effect on interstate commerce.

HALL, Circuit Judge, dissenting:

I agree with the majority that 18 U.S.C. § 247 is facially constitutional. I do not agree with its conclusion that the statute is unconstitutional as applied to Ballinger. The facts to which Ballinger stipulated provide not one but two bases for finding that he committed acts which Congress may prohibit: 1) the effects of his crimes on interstate commerce, and 2) his travel across state lines in order to commit them. While the majority simply ignores the second of these bases, Ballinger's use of the channels of interstate commerce in order to burn churches in Georgia unambiguously places him within Congress' power of sanction.

Moreover, even were this not so, I would still reject Ballinger's "as applied" challenge because his acts of arson did substantially affect interstate commerce. To find to the contrary, the majority ignores the extent to which the churches provide services to out-of-state members and guests, adopting a cramped notion of church commerce at odds with both Supreme Court precedent and this circuit's own holding in United States v. Odom, 252 F.3d 1289 (11th Cir. 2001).

## I. Ballinger's Use of the Channels of Commerce

Because the majority relegates all discussion of Ballinger's interstate travel to a single sentence appended to the end of its fact recitation and an associated footnote, I begin with a full accounting of the relevant facts to which he stipulated.

28

Ballinger, a resident of Indiana, was a practicing "Luciferian," who expressed hostility toward organized Christianity and described his burning of churches as his "work" and "business." At some point prior to the crimes before the Court, Ballinger became aware of a call placed by the FBI to his parents' home. Partly out of concern about that call, he and his girlfriend packed his Indiana-registered van and drove to Georgia. Along the way, Ballinger used the interstate highway system, purchased gasoline and other goods, and stayed in various hotels. He also deliberately set fire to three churches, one each in Indiana, Kentucky, and Tennessee.

Ballinger then arrived in Georgia, upon which he immediately began his arson spree in that state. Within hours of checking into a hotel in Dalton on December 22, 1998, Ballinger committed the first of the church arsons for which he was indicted. He first used his Indiana VISA card to purchase a large plastic gas can from a local K-Mart. He then waited until after midnight in order to reduce the danger of being seen, and drove to the Amazing Grace Baptist Church. Using a tool brought with him from Indiana, Ballinger broke one of the church's windows and then poured gasoline from his van into the opening and ignited it with a cigarette lighter. Afterwards, Ballinger drove back to the hotel where he spent the night.

The next night, Ballinger committed another church arson in a similar manner, and on the third night, he did so again, this time in Walton County. At that point, the Christmas holiday had arrived, and he waited for it to pass before burning the fourth and fifth churches on New Years Eve. Ballinger then stayed in Athens for several days before taking the return trip home to Indiana. Along the way, he set fire to three more churches in Kentucky.

These facts are sufficient to subject Ballinger to Congress' commerce clause authority independent of any connection between the churches he burned and interstate commerce. It is well established that Congress may forbid or punish the use of channels of interstate commerce "to promote immorality, dishonesty, or the spread of any evil or harm to the people of other states from the state of origin." Brooks v. United States, 267 U.S. 432, 436, (1925); see also Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 256 (1964); North American Co. v. SEC, 327 U.S. 686, 705 (1946) ("Congress may impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral or economic nature."); Caminetti v. United States, 242 U.S. 470, 491 (1917) ("[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and

is no longer open to question.").  In early Supreme Court cases applying this proposition, the facts and statutes at issue involved one person causing another person or thing to be transported across state lines for harmful purposes.  See e.g., Brooks, 267 U.S. at 436 (transportation of stolen automobiles across state lines); Caminetti, 242 U.S. at 482-483 (transporting women across state lines for the purpose of concubinage);  Hoke v. United States, 227 U.S. 308, 317 (1913) (inducing a woman to travel in interstate commerce for the purpose of prostitution);  Champion v. Ames, 188 U.S. 321, 323 (1903) (transportation of lottery tickets across state lines); see also United States v. Orito, 413 U.S. 139, 143 (1973) (interstate transportation of obscene materials for private use).   However, the principle also applies to transportation of oneself across state lines for the purpose of committing a harmful or immoral act, since it is no less commerce to cause oneself to be transported over state lines in order to interact with those from other states than to cause another to be so transported.  See e.g., Hoke, 227 U.S. at 320 ("Commerce among the states, we have said, consists of intercourse and traffic between their citizens, and includes the transportation of persons and property.").  Thus, in United States v. Morrison, the Supreme Court noted that Courts of Appeals have uniformly upheld Section 40221(a) of the Violence Against Women's Act, codified 18 U.S.C. § 2261(a)(1),  which punishes interstate travel

31

with the intent to injure, harass, or intimidate a spouse.  529 U.S. 598, 613 fn. 5 (2000) (citing United States v. Lankford, 196 F.3d 563, 571 (1999) for a survey of jurisdictions).   In short, Congress may prohibit travel across state lines undertaken in order to commit immoral acts.

It is precisely such regulation that is at issue in this case.  Ballinger's actions placed him squarely within the bounds of Congress' power to regulate because he used interstate commerce as an agency to promote criminal acts of arson.  In addition to the obvious fact that it was necessary for him to travel across state lines in order to commit arson in Georgia (as well as Tennessee and Kentucky), the immediacy with which he set out to destroy churches once he arrived and the absence of any indication that he had other business in Georgia demonstrate that he used the channels of interstate commerce for the purpose of committing arson. That he additionally may have been attempting to evade the FBI or conceal his connection to a pattern of offenses is of no import, as we recognize that the use of interstate travel to conceal the trail of crime and avoid capture is itself a "gross misuse of interstate commerce."  Brooks, 267 U.S. at 439.

Indeed, all of this is so plain that Ballinger does not challenge the proposition that his actions can be punished as a misuse of the channels of commerce under the Constitution.   Rather, he contends that Section 247 does not

cover such actions. This claim can be disposed of quickly. The jurisdictional "hook" contained is Section 247(b) states that the statute's substantive provisions apply when "the offense is in or affects interstate or foreign commerce." 18 U.S.C. § 247(b). The Supreme Court has repeatedly held that such "in or affects" language indicates Congress' intent to invoke its full authority under the Commerce Clause. See e.g., Jones v. United States, 529 U.S. 848, 854 (2000); Scarborough v. United States, 341 U.S. 563, 571 (1977); United States v. American Bldg. Maint. Indust., 422 U.S. 271, 280 (1975). In this instance, it signals the intent to include travel for the purpose of committing arson.

Ballinger nevertheless argues that he is not covered because the text of Section 247(b) states that it is the offense that must be "in" or "affect" interstate commerce; a fact which he reads to signify that the statute's prohibition on arson extends to use of the channels of interstate commerce only to the extent that the ignition of a match or other flammable object and its use to damage or destroy religious real property occurs while "in" commerce. In addition to the fact that such a nonsensical reading would make a mockery of Congress' intent in passing the statute, any ambiguity created by use of the term "offense" in combination with the term of art "in or affects" is immediately clarified by the legislative history.

In the face of a what was perceived as national epidemic of attacks on

33

churches, Congress unanimously passed the Church Arson Prevention Act of 1996

in order to broaden the scope of the old arson law, which had required that "in

committing the offense, the defendant travels in interstate or foreign commerce, or

uses a facility or instrumentality of interstate or foreign commerce in interstate or

foreign commerce." Pub. L. No. 100-346, § 1, 102 Stat 644 (1988). The House

Report accompanying the amended language explained that the new version:

> broadens the jurisdictional scope of the statute by applying criminal penalties if the offense "is in or affects interstate or foreign commerce." This formulation grants Federal jurisdiction, and thus extends the Attorney General's ability to prosecute cases, as to any conduct which falls within the interstate commerce clause of the Constitution.
>
> Under this new formulation of the interstate commerce requirement, the Committee intends that <u>where in committing, planning, or preparing to commit the offense</u>, the defendant either travels in interstate or foreign commerce, or uses the mail or any facility or instrumentality of interstate or foreign commerce, the statute will be satisfied.

1996 U.S.C.C.A.N. 1082, 1087-88 (emphasis added). The corresponding Senate

Report, while terse, also emphasizes the breadth of Congress' intent. <u>See</u> 142

Cong. Rec. S7908-4 ("[I]t is the intent of Congress to exercise the fullest reach of

the Federal Commerce Power.") As these statements show, Congress was using a

notion of "offense" broader than the *actus reus* necessary to establish that a

defendant has gone far enough in carrying out a criminal plan to be generally

sanctionable under doctrines of criminal law. Rather, offense "in" is most

reasonably interpreted as specifying the intent to apply the substantive provisions of Section 247 in part to cases in which the offender has undertaken an interstate trip or otherwise entered into interstate commerce in order to destroy churches and as a necessary part of a plan to do so.

In sum, Section 247 invokes the entirety of Congress' Commerce Clause authority to prohibit acts of church arson in connection with interstate or foreign commerce. This authority includes the power to regulate use of the channels of interstate commerce for the purpose of committing such arson. As Ballinger has used the interstate highway system for precisely this purpose, the statute is constitutional as applied to him.

## II.  Church Connections to Interstate Commerce

Because Ballinger's travel across state lines provides an independent basis for finding Section 247 constitutional as applied to him, I would not consider whether each of the churches' own activities provide a sufficient nexus to interstate commerce to do so. However, were I to assume along with the majority that the power to regulate the channels of commerce does not resolve the issue, I would still find application of the statute constitutional in this case because the stipulated facts demonstrate that the destruction of each of the church buildings had a substantial effect on interstate commerce.

35

Pursuant to its authority under the Commerce Clause, Congress may regulate

intrastate activities of a non-economic nature where the regulation is limited to a

discrete set of actions which can be individually shown to have a concrete

connection with or substantial effect on interstate commerce. See Morrison, 529

U.S. at 611-612; United States v. Lopez, 514 U.S. 549, 561-562 (1995); see also

Odom, 252 F.3d at 1295-96; Bellflower v. United States, 129 F.3d 1459, 1461

(11th Cir. 1997).[1]

---

[1]In resolving the constitutional question on the particular facts of this case, it is not necessary to decide whether church arson is an economic activity or whether the relation to interstate commerce under a statute employing a jurisdictional "hook" such as the one in Section 247 must be "substantial." I assume without deciding that the majority applies the correct test by requiring the government to show that Ballinger's actions substantially affected interstate commerce without use of aggregation.

It is worth noting, however, that the majority's conclusions in this regard do not follow unproblematically from prior precedent. The Supreme Court acknowledged in Morrison, that the economic/non-economic distinction is an awkward one, see 529 U.S. at 610, and the emerging case law attempting to apply it betrays a fair amount of inconsistency. In the most closely analogous case, United States v. Odom, this Court held that the defendant could not be prosecuted for arson of a church under 18 U.S.C. § 844(i) using an aggregation theory. 252 F.3d at 1297. However, prior case law found aggregation under Section 844 appropriate where the property subjected to arson was used for a commercial enterprise. See United States v. Dascenzo, 152 F.3d 1300, 1303 (11th Cir. 1998) (rental property); United States v. Chowdhury, 118 F.3d 742, 745 (11th Cir. 1997) (restaurant). This result can only be explained in one of two ways: either arson is an economic activity under such circumstances, or it is not economic but the commercial nature of the target permits aggregation. Since Odom also found that the church at issue was actively used in commerce, 252 F.3d at 1295, it is difficult to discern the basis on which the Court distinguished that case. Meanwhile, this Circuit has also recently found that the Hobbs Act, which makes robbery a federal offense so long as it affects commerce, regulates an economic activity. United States v. Gray, 260 F.3d 1267, 1274 (11th Cir. 2001). I fail to see why taking personal property is an economic activity while destroying real property that is used in commerce is not.

Nor is the result reached in Odom required by recent Supreme Court precedent. While Morrison identified violence against a person as a traditional province of state regulation, it limited the holding that such crime was non-economic to "intrastate violence that is not directed

36

What it means to "substantially affect" interstate commerce in this context is not entirely clear. However, it must at least include the destruction of buildings that are actively and regularly employed in interstate commerce. In both <u>Lopez</u> and <u>Morrison</u>, the Supreme Court reaffirmed that Congress may legislate to "protect. . .

at the instrumentalities, channels, or goods involved in interstate commerce." 529 U.S. at 617-18. Since churches are at least sometimes used in interstate commerce, Section 247 is distinguishable from the Violence Against Women Act. Similarly, while <u>Jones v. United States</u>, 529 U.S. 848, 854-57 (2000), held that 18 U.S.C. § 844(i) must be read, consistent with the concerns articulated in <u>Lopez</u>, as limited to property actively used for commerce or in activities affecting commerce, it did not speak to the question of aggregation.

       As to the question whether the government must show that the effect is "substantial," the case law again provides inconsistent guidance. Although <u>Lopez</u> held that "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce" 514 U.S. at 559, it did so in the context of discussing prior case law regulating intrastate economic activity. In the economic sphere, individual acts within a state may have no appreciable impact on interstate commerce or traceable connection to persons or things in another state, and yet it is recognized that the proper functioning of interstate markets may require regulation of the category of acts of which they are a part. This is the basis of the aggregation principle. <u>See</u> <u>Wickard v. Filburn</u>, 317 U.S. 111, 128 (1942). In this case the Commerce Clause inquiry is framed in terms of the effect that a category of activities has as a whole on interstate commerce writ large--a determination that is susceptible to the noise of large numbers--and a determination of substantiality is arguably required to demonstrate that a sufficient connection to interstate commerce exists despite the fact that it has not been demonstrated on a case by case basis. However, where a statute requires that a regulated person or associated object must be "in" or "affect" commerce, a concrete traceable connection to interstate commerce must be demonstrated at the individual level, and the same concerns do not apply.

       Perhaps for this reason, this court has on several occasions read the substantiality requirement articulated in <u>Lopez</u> as limited to statutes that regulate intrastate activities without including a jurisdictional element ensuring a connection to interstate commerce in each case. <u>See</u> <u>e.g.</u>, <u>Dascenzo</u>, 152 F.3d at 1320-1303 (expressing "doubt"); <u>Castleberry</u>, 116 F.3d 1384, 1387 (11th Cir. 1997) (only a minimal effect on interstate commerce required under the Hobbs Act due to jurisdictional element); <u>U.S. v. McAllister</u>, 77 F.3d 387, 390 (11th Cir. 1996) (finding a "minimal nexus" sufficient where a jurisdictional element written into a statute criminalizing possession of a firearm shows that the statute is aimed at regulating an object connected to interstate commerce). On the other hand, both <u>Odom</u>, and <u>United States v. Denalli</u>, 73 F.3d 328 (11th Cir. 1996) (modified, 90 F.3d 444 (11th Cir. 1996)) apply the "substantially affects" test in this context.

persons or things in interstate commerce." Lopez, 514 U.S. at 558, Morrison 529

U.S. at 609. By noting that this was true "even though the threat may come only

from intrastate activities," Lopez, 514 U.S. at 558, the Court recognized that in this

context the quantum of effect on interstate commerce generally required of purely

intrastate activities is present by definition. More plainly, a person who destroys a

thing "in" interstate commerce substantially affects such commerce. Further, when

an organization engages in interstate commerce, it is "in commerce" and may be

regulated or protected. See United States v. Robertson, 514 U.S. 669, 672 (1995)

(per curiam) (no need to show that a mining operation "affected" interstate

commerce to fall within Congress' power to regulate because the effects test

applies to purely intrastate activities and the mine "engaged 'in commerce.'").

Correspondingly, when it uses its real property for that purpose, the property is

also "in commerce" and its destruction "substantially affects" such commerce.[2]

Consistent with this principle, case law interpreting the omnibus arson

statute, 18 U.S.C. § 844(i), to conform to the requirements of the Commerce

Clause has consistently held the arson of property actively used in interstate

commerce to be within its purview. See Jones, 529 U.S. at 859; Russell v. United

---

[2]Obviously, under such circumstances the protection of the organization "in commerce" requires protection of the property it employs in order to be "in commerce."

States, 471 U.S. 858, 862 (1985); U.S. v. Williams, 2002 WL 1752293, *3-4 (3rd Cir. 2002); Odom, 252 F.3d at 1995; U.S. v. Cristobal, 293 F.3d 134, 145-46 (4th Cir. 2002); United States v. Grassie, 237 F.3d 1199, 1207-08 (10th Cir. 2001). Indeed, in Jones, the Supreme Court interpreted Section 844(i) to require merely "active employment for commercial purposes" without any mention of the term "interstate," thereby preserving it prior holding in Russell v. United States, 471 U.S. 858, 862 (1985) that the statute applied to a building used as rental property without further evidence of an interstate connection. 529 U.S. at 848, 859 (distinguishing "active employment" from "merely a passive, passing, or past connection to commerce.") In interpreting Section 844(i) in this way, the Court noted that doing so allowed it to avoid the constitutional question related to regulating "traditionally local criminal conduct" raised in Lopez. Id. at 858. This Circuit has required more in the church context, finding that mere engagement in local commerce was too nominal a connection to interstate commerce to preserve the distinction between spheres of national and local authority. Odom, 252 F.3d at 1295-96. Even in Odom, however, the distinction was held to be preserved by interpreting Section 844(i) to require the government to show "that the function of the property involves the active engagement in commerce and the property either has a direct and regular connection to interstate commerce or a substantial

39

connection to interstate commerce." 252 F.3d at 1296 (internal citations omitted).

Odom also provides specific guidance on the types of activities that qualify as commerce in this context. Although the Court noted that churches are not commonly considered business enterprises, it concluded that they nevertheless "can and do engage in commerce." Id. at 1289. As the Court held:

> The business or commerce of a church involves the solicitation and receipt of donations, and the provision of spiritual, social, community, educational (religious or non-religious) and other charitable services. . . . In general, churches engage in activities and provide services to their members, to their community and to the public at large; churches solicit contributions to provide these services; and they purchase goods necessary to provide these services. Accordingly, the evidence proving that a church building is used in or affects interstate commerce must relate to these activities–i.e. whereby it engages in activities relating to its "business" *as* a church.
>
> The purchase and receipt of goods or services necessary for or common to the maintenance of any building, such as gas, electricity, insurance, or mortgage loans, do not prove that the function of the building is to engage in commerce. . . . On the other hand, the receipt of donations, the purchase of hymnals and payment of dues are the type of commercial activities by which a church would conduct its business as a church, and therefore engage in commerce.

Id. at 1295-96 (internal citations omitted). The fact that churches do not engage in trading for profit, does not alter this conclusion. Id. at 1295; see also Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 584-6 (1997) (concluding that the Commerce Clause applies to charitable and non-profit organizations). Churches are institutions that facilitate the interchange of ideas,

40

goods and services across a religious community that may span multiple states, as well as between that community as such and the outside world. This is paradigmatic "commerce."[3]

Thus, the destruction of real property owned by a church may have a substantial affect on interstate commerce depending on the territorial scope of the religious community served by the church, the specific commercial activities in which it engaged or engages, and the extent to which it used the property in conducting those activities. Because destroying churches is an activity aimed at institutions generally engaged in commerce, it is not necessary to resort to the logic of aggregation to find that it may substantially affect interstate commerce. Nor is the effect on interstate commerce so attenuated as to raise structural concerns about regulation of issues that are not truly national. Rather, the subject of 18 U.S.C. § 247 is, in part, actions which constitute a direct attack on the functioning of commerce through institutions that may operate on an interstate scale.

In light of these principles, I would find that the stipulated facts in this case

---

[3]As Justice Marshall wrote long ago, "The subject to be regulated is commerce. . . . The counsel for the appellee would limit it to traffic, to buying and selling, or the interchange of commodities, and do not admit that it comprehends navigation. This would restrict a general term, applicable to many objects, to one of its significations. Commerce, undoubtedly, is traffic, but it is something more: it is intercourse." Gibbons v. Ogden 22 U.S. 1, 189-190 (1824).

establish that each of the 5 church buildings burned was sufficiently involved in interstate commerce to satisfy the jurisdictional requirements of Section 247. Each church purchased religious materials, not merely generic supplies or insurance used in buildings generally, from a variety of out-of-state sources. As held in Odom, the purchase, delivery, and dissemination of religious and related materials is church commerce. 252 F.3d at 1295. Further, several of the churches also participated in interstate charities and engaged in fund raising on an interstate level. Most importantly, all five of the churches regularly used their buildings either to host out-of-state guests, such as visiting pastors, or hold services that were attended by one or more out-of-state members.[4] While the purchases of religious materials and fairly minimal evidence of participation in national charities in some instances might constitute connections between the churches and interstate commerce that are "too passive, too minimal and too indirect" to satisfy the Commerce Clause, that fact that each church building was in addition regularly used to provide religious and other services to a community including out-of-state members and guests demonstrates active employment in interstate commerce.

To find to the contrary, the majority attempts to exclude consideration of the

---

[4]Although there was some ambiguity in the stipulated facts, the District Court also relied on the assertions of the parties before it to find that Johnson United served as a voting precinct for local and national elections.

42

hosting services that the churches provided to out-of-state members and other visitors, enlisting a single district court opinion for the proposition that the provision of services which are spiritual in nature does not qualify as interstate commerce even if those services are provided to members from out of state.[5] Such a categorical exclusion is inappropriate because it is in direct conflict with this Circuit's own holding in Odom.  See 252 F.3d 1294-95.  Moreover, it is also at odds with the long line of cases extending back to Ogden, that establish that intercourse between peoples of different states and the travel or transportation that is necessary to its accomplishment is commerce without regard to whether such intercourse is for material gain.  See e.g., Heart of Atlanta, 379 U.S. at 255-56 (quoting Ogden and concluding, "that the 'intercourse' of which the Chief Justice

_____

[5]  It also engages in an oddly segmented and formalistic analysis of the facts, describing each category of activity in which the churches were involved seriatim and employing prior cases in which activities of the type described were found to be insufficient as support for the proposition that they must also be so here.  In taking this approach, the majority appears not to consider the extent of these activities even in cases, such as charitable operations and purchases of religious materials, where the activity is of a type that may show that the function of a building is to engage in interstate commerce. See Odom, 252 F.3d at 1295.  The logical fallacy of such an approach is demonstrated by the fact that each of the authorities cited by the majority save United States v. Rayborn, 138 F. Supp. 2d 1029, 1036 (W.D. Tenn. 2001)--the opinion from which the majority derives its narrow notion of commerce--involved substantially less evidence of use in interstate commerce than is the case here.  See Odom, 252 U.S. at 1292 (purchase of natural gas, a small amount of religious materials, receipt of donations from one out of state couple, and membership in a intrastate church organization with national umbrella); United States v. Johnson, 194 F.3d 657, 659 (5th Cir. 2001) (reconsidered 246 F.3d 749) (out of state insurer, contributions to an in-state organization that were then sent out of state); United States v. Rea, 223 F.3d 741, 743 (8th Cir. 2000) (reversing United States v. Rea, 169 F.3d 1111 (8th Cir. 1999) in light of Jones)  (gas and religious texts purchased out of state).

spoke included the movement of persons through more than States than one was settled as early as 1849. . . . Nor does it make any difference whether the transportation is commercial in character."); U.S. v. Hill, 248 U.S. 420, 423 (1919) ("Importation into one state from another is the indispensable element, the test, of interstate commerce."); Caminetti, 242 U.S. at 491 (holding that importation of a woman for immoral purposes may constitutionally be regulated even when it is not for material gain). The provision of spiritual services may not be an "economic" activity is some senses, but a religious community that interacts across state lines is engaged in interstate commerce.

Nor is such a rule required by the structural concerns raised in Lopez. Contrary to the opinion cited by the majority, Lopez did not seek to maintain a distinction between materially and non-materially motivated activities of an inter-state nature. Rather, it sought to maintain a distinction between the national and the local, and used the distinction between economic and non-economic activities merely to cabin the power of Congress to regulate purely intrastate activities. Lopez, 514 U.S. at 559-560, 568; see also Morrison, 524 U.S. at 617-618. To recognize that a particular Church may provide spiritual or religious services to an audience that reaches beyond state lines is not to obliterate such a distinction.

In sum, Ballinger's travel in interstate commerce was sufficient to subject

44

him to the punishment Congress intended in enacting 18 U.S.C. § 247. Moreover, the regular and active use of the church buildings he destroyed in interstate commerce and the effects of their destruction on such commerce serve as an independent basis for the statute's application. I respectfully dissent.